Elissa Gershon, State Bar No. 169741
Elissa.Gershon@disabilityrightsca.org
Anne Hadreas, State Bar No. 253377
Anne.hadreas@disabilityrightsca.org
DISABILITY RIGHTS CALIFORNIA
1330 Broadway, Suite 500
Oakland, CA 94612
Telephone: (510) 267-1200
Fax: (510) 267-1201

Betsy Havens, State Bar No. 296842
Betsy.Havens@disabilityrightsca.org
Marilyn Holle, State Bar No. 61530
Marilyn.Holle@disabilityrightsca.org
DISABILITY RIGHTS CALIFORNIA
350 South Bixel Street, Suite 2
Los Angeles, California 90017
Telephone: (213) 213-8000
Fax: (213) 213-8001

[Additional Counsel on following page]

Attorneys for Plaintiffs JERRY THOMAS,
SEAN BENISON, and JUAN PALOMARES

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

JERRY THOMAS, et al.

        Plaintiff(s),

  vs.

JENNIFER KENT, et al.

        Defendant(s).

Case Number: 14-CV-08013-FMO(AGRx)

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO STAY**

Hearing:     September 8, 2016, 10 a.m.
Courtroom:  22, 5th Floor
Judge:       Hon. Fernando M. Olguin
Trial Date:   10/11/2016
Action Filed: 10/16/2014

1  Robert D. Newman, State Bar No. 86534
   rnewman@wclp.org
2  Mona Tawatao, State Bar No. 128779
   mtawatao@wclp.org
3  Sue Himmelrich, State Bar No. 110664
   shimmelrich@wclp.org
4
   WESTERN CENTER ON LAW AND POVERTY
5  3701 Wilshire Boulevard, Suite 208
6  Los Angeles, CA 90010-2826
   Telephone: (213) 487-7211
7  Facsimile: (213) 487-0242
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................ 1

II.   FACTUAL BACKGROUND ..................................................................... 1

    A.    Procedural History:  The Waiver Amendment and Waiver Renewal........... 1

    B.    Plaintiffs' Individual Claims.......................................................... 4

    C.    Other Waiver Participants and Applicants Continue to be Subjected
          to Waiver Cost Limits ................................................................... 5

III.  ARGUMENT ............................................................................................... 7

    A.    The Ninth Circuit Disfavors Stays for Cases that Are Anticipatorily
          Moot ............................................................................................. 7

    B.    This Case Will Not "Definitely Be Moot," Contrary to Defendants'
          Claims.......................................................................................... 9

          1.    Defendants Cannot Overcome The "Heavy Burden" To Prove
                 That Claims Are Moot After Voluntary Cessation Of Illegal
                 Behavior. ........................................................................... 9

          2.    Plaintiffs' Claims Fall within the "Capable of Repetition Yet
                 Evading Review" Exception to the Mootness Doctrine. .................. 13

IV.   CONCLUSION ........................................................................................... 14

1

# TABLE OF AUTHORITIES

2

**Federal Cases**

3

*A.D. ex rel. L.D. v. State of Hawaii Dept. of Ed*.
    727 F.3d 911 (9th Cir. 2013) ................................................................................. 14

*Alaska Ctr. for the Env't v. U.S. Forest Serv.*
    189 F.3d 851 (9th Cir.1999) ................................................................................. 14

*Alliance for the Wild Rockies v. Marten*
    CV-15-99-M-BMM, ___F. Supp. 3d____, 2016 WL 4069866 (D. Mont. July 27, 2016) ................................................................................................................................. 8

*Bell v. City of Boise*
    709 F.3d 890 (9th Cir. 2013). ................................................................................. 10

*Brantley v. Maxwell-Jolly*
    656 F. Supp. 2d 1161 (N.D. Cal. 2009) ........................................................ 11, 12

*California Trout, Inc. v. U.S. Bureau of Reclamation*
    115 F. Supp. 3d 1102 (C.D. Cal. 2015) ................................................................. 8

*Conservation Council for Hawaii v. Natl. Marine Fisheries Serv.*
    97 F. Supp. 3d 1210 (D. Haw. 2015) ................................................................. 8

*Conservation L. Found. v. Pritzker*
    37 F. Supp. 3d 254 (D.D.C. 2014) ................................................................. 7

*Conservation Law Found. v. Natl. Oceanic and Atmospheric Admin.*
    14-5135, 2014 WL 4627848 (D.C. Cir. July 24, 2014) ......................................... 8

*Davison v. Plowman*
    1:16-CV-0180, 2016 WL 3167394 (E.D. Va. June 6, 2016) ................................ 10

*Defenders of Wildlife v. Hall*
    CV 08–14–M–DWM, 2011 WL 1740312 (D. Mont. May 4, 2011) ...................... 7

*Federal Election Commission v. Wisconsin Right to Life, Inc.*
    551 U.S. 449 (2007) ................................................................................................. 13

*Greenpeace Action v. Franklin*
    14 F.3d 1324 (9th Cir.1993) ................................................................................. 14

*Hunt v. Imperial Merchant Services, Inc.*
    560 F.3d 1137 (9th Cir. 2009) ............................................................ 7

*Landis v. North American. Co.*
    299 U.S. 248 (1936) .......................................................................... 7

*Lockyer v. Mirant Corp.*
    398 F.3d 1098 (9th Cir. 2005) ........................................................... 8

*Olmstead v. L.C. ex rel. Zimring*
    527 U.S. 581 (1999) ........................................................................ 13

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*
    551 U.S. 701 (2007) ........................................................................ 10

*Rosebrock v. Hoffman*
    135 S. Ct. 1893 (2015). ................................................................... 10

*Rosebrock v. Mathis*
    745 F.3d 963 (9th Cir. 2014) ........................................................... 10

*Tinsley v. Kemp*
    750 F.Supp. 1001 (W.D.Mo.1990) ..................................................... 8

*V.L. v. Wagner*
    669 F. Supp. 2d 1106 (N.D. Cal. 2009) ............................................ 12

*White v. Lee*
    227 F.3d 1214 (9th Cir.2000): ...................................................... 9, 10

# I.    INTRODUCTION

To quote from Yogi Berra, it is "déjà vu all over again" as Defendants again attempt to delay Plaintiffs' progress towards a resolution of this case. This time Defendants rework their motion to dismiss Plaintiffs' claims on mootness grounds as now a motion to stay Plaintiffs' claims on possible future mootness grounds. Defendants' arguments are virtually identical to their arguments in opposition to Plaintiffs' motion for summary judgment, a motion Defendants desperately want to forestall. Plaintiffs have twice shown in their motion for summary judgment, as well as in their opposition to Defendants' prior motion to dismiss: this case is not and will not be moot.  The Department of Justice's Supplemental Statement of Interest[1] says it well: "Defendants' narrow focus on the steps the state can take to remove the individual cost limits from the current waiver ignores the legal reality that federal approval of the proposed amendment will not *necessarily* bring the State into compliance with the ADA." (Emphasis in original.)  DOJ Suppl. Statement (ECF No. 171) at 2:8-10.

Defendants' machinations are to no avail. The Waiver Amendment will not be final until October 2016 at the earliest if at all, and the Waiver Renewal will not take effect until January 2017.  Neither the proposed Amendment nor the Renewal "eliminate" the cost limits as Defendants assert.  Defendants are not entitled to a stay on the ground that Plaintiffs' claims are "anticipatorily moot."  And, as the Department of Justice made clear, the Waiver Amendment and Renewal will not automatically moot Plaintiffs' claims *even if they are approved*, which is by no means guaranteed. Defendants' motion to stay should be denied.

# II.    FACTUAL BACKGROUND

## A.    Procedural History:  The Waiver Amendment and Waiver Renewal

In support of their mootness arguments, Defendants first revealed the existence of a potential Waiver Amendment on March 30, 2016 in their reply briefing to their Motion

---

[1] The Department of Justice filed a Statement of Interest in support of Plaintiffs' first Summary Judgment Motion and have recently filed a Supplemental Statement of Interest. ECF Nos. 112, 171.

to Dismiss and their Supplemental Memorandum in opposition to Plaintiffs' Motion for

Summary Judgment. Defs.' Reply re Mot. to Dismiss (ECF No. 117) at 3:3-16, 9:19-26;

Defs.' Suppl. Mem. Opp'n to Mot. Summ, J. (ECF No. 118) at 1:7-12.  On April 15,

2016, Defendants submitted a proposed amendment to the current Waiver to the Centers

for Medicare and Medicaid Services ("CMS").  Schupp Decl. Apr. 15, 2016 (ECF No.

136-1) at 2:19-22, Schupp Decl. Ex. A (ECF Nos. 136-2, 136-3).  Since then,

Defendants have submitted three revised versions of the amendment application in

response to questions from CMS, the most recent on June 27, 2016.  Gershon Decl. at ¶.

9; Schupp Decl. July 8, 2016 (ECF No. 177) at 3:5-9, Schupp Decl. Ex. A (June 27

Proposed Waiver Amendment Appl.) (ECF Nos. 177-1, 177-2, 177-3).  The Waiver

Amendment has not yet been approved; on July 14, 2016, CMS issued a formal Request

for Additional Information, thereby initiating a new, 90-day review period.  Gershon

Decl. at ¶ 9.  Thus, the Waiver Amendment is not likely to be approved before October,

2016, if at all.  *Id*. The proposed Waiver Amendment utilizes the current Waiver cost

limits in the form of "cost amounts" for authorization of services without a second level

of review.  Schupp Decl. July 8, 2016 Ex. A (June 27 Proposed Waiver Amendment

Appl.) (ECF No. 177-1) at DHCS 18328.  The "second level of review" is discretionary

and has no timelines, criteria, policies, or procedures for implementation.  *Id.*; Defs.'

Resp. to Pltfs.' 2nd Req. for Adm. Nos. 20, 21, 24, 30, 31;  Schupp Dep. May 17, 2016

99:20-101:20, 104:2-12, 118:14-23, 121:4-9; Schupp Dep. May 27, 2016 31:6-10, 31:16-

33:7, 60:4-61:21; King-Broomfield Dep. June 2, 2016 14:5-12, 21:20-23, 22:4-24, 23:6-

11, 26:16-23, 34:5-21, 36:1-38:7. DHCS has not even determined if Waiver participants

and providers will even be informed about the Waiver Amendment. Schupp Dep. May

17, 2016 116:6-118:8.

On June 10, 2016, DHCS released a 15-page summary of its proposed Waiver

Renewal, which is expected to be submitted to CMS by October 2016. Schupp Decl.

July 8, 2016 (ECF No. 177) at 3:14-16, 4:6; Schupp Decl. July 8, 2016 Ex. B (Waiver

Renewal Summary) (ECF No. 177-4).  If approved, the renewed Waiver would be

effective January 1, 2017.  Schupp Decl. July 8, 2016 (ECF No. 177) at 4:7.  The Waiver Renewal summary states that: "The State is proposing to change from an individual cost limit to an individual cost limit that calculates cost neutrality in the aggregate across all Waiver Participants." Schupp Decl. July 8, 2016 Ex. B (Waiver Renewal Summary) (ECF No. 177-4) at DHCS16786. Despite producing thousands of pages of documents related to the Waiver Renewal in the course of this litigation, DHCS has produced no policies, procedures, training materials, informing notices, fiscal analyses or estimates, or any other documents that would explain or elaborate on this cryptic summary of the Renewal.  Gershon Decl.  ¶ 6.

Since the first round of what was to be dispositive motion briefing in the case, originally scheduled for a March 10, 2016 cut-off, Defendants have tactically sought to delay resolution of this case. As a result of Defendants' filings regarding the Waiver Amendment, on April 27, 2016, the Court re-opened discovery on the Waiver Amendment and set a new cut-off for this discovery of June 3, 2016. Order Re: Pending Mots. & Further Proceedings (ECF No. 139). Defendants then sought to limit Plaintiffs' discovery but the Court refused Defendants' request on May 31, 2016, noting "defendants have little need to conduct discovery regarding their own proposed amendment."  Order Re: Ex Parte Appl. & Further Disc. Proceedings, May 31, 2016 (ECF No. 143) at 1. When Defendants refused to meet and confer with Plaintiffs concerning their summary judgment motion, Plaintiffs were forced to seek the Court's help, resulting in the Court's June 22, 2016 order stating, "defendants' refusal to engage in the mandatory meet and confer process is compounded by their failure to comply with the court's discovery deadlines."  Order Re: Ex Parte Appl. & Further Disc. Proceedings, June 22, 2016 (ECF No. 146) at 1:24-26.  Plaintiffs filed their second motion for summary judgment on July 18, 2016, as the Court ordered. Mem. P. & A. Summ. J., (ECF No. 152). Over Plaintiffs' objections, Defendants based much of their opposition to the second summary judgment motion on the same arguments made in their original motion to dismiss, but added the Waiver Renewal to their mootness arguments. *Id.*

1    **B.    Plaintiffs' Individual Claims**

2        Plaintiffs have already detailed in their motions for summary judgment

3    Defendants' arithmetic errors and misplaced assumptions that undercut Defendants'

4    argument that Plaintiffs' individual claims are moot.  See Mem. P. & A. Summ. J., (ECF

5    No. 152) at 25:1-26:7; Pls.' Suppl. Mem. Re: Summ. J. (ECF No. 161) at 4:5-20.  The

6    short of it is: 1) Mr. Thomas's doctor has ordered 24 hours per day of nursing care which

7    Defendants have not authorized; and 2) Mssrs. Benison and Palomares are each

8    authorized for approximately 673 hours of  "direct care,"[2] 47 hours short of the direct

9    care that their respective physicians have ordered. Gershon Decl. at ¶ 16.  Because

10    Defendants continue to refuse to approve medically necessary services, Plaintiffs will

11    continue to suffer until this case is resolved.

12        In addition, Defendants continue to insist that that it is "impossible" to promise

13    Plaintiffs that they will continue to receive the services they need.  In support of their

14    motion to stay, Defendants submit the following sworn declaration testimony of Rebecca

15    Schupp, DHCS's designated 30(b)(6) witness:

16        [i]t is impossible for the Department to make long-term, indefinite

17        commitments to individual participants, including Plaintiffs, regarding the

18        exact services they will receive, and under what program they will receive

19        such services.  Such commitments are also impossible given the potential

20        changes in participants' conditions, diagnoses, and circumstances.

21    Schupp Decl., Feb. 26, 2016, (ECF No. 176) at ¶ 28, 7:22-27.

22        Finally, it is significant both to their motion to stay and their claim of

23    "anticipatory mootness" that Defendants refused to provide Plaintiffs services over their

24    respective cost caps until a full year after this case was filed.  This, coupled with

25    Defendants' refusal to make any future commitments, requires that this matter proceed

26    on the merits.

27    _____

28    [2] The Waiver defines "direct care" as "hands on care to support the care needs of the
     waiver participant" provided by a nurse, IHSS worker, or WPCS worker.

4

### C.    Other Waiver Participants and Applicants Continue to be Subjected to Waiver Cost Limits

A delay in the resolution of this case would also harm other people with disabilities who currently qualify for and/or participate in the Waiver program. Notwithstanding Defendants' representations that they have an "ongoing practice" of approving Waiver services over the cost limits (Mot. to Stay at 12:26-28, ECF No. 175), individuals continue to be denied medically necessary services because of the cost limits. Specifically, Disability Rights California ("DRC") regularly receives calls from individuals who are not authorized for the Waiver services they need, or who are faced with cuts in their Waiver services, due to the Waiver cost limits.  Gershon Decl. at ¶ 14. In 2016, DRC has assisted at least 13 such individuals.  *Id.*

Some individuals are applicants for the Waiver who have been receiving in-home nursing and/or attendant care through the Medi-Cal Early and Periodic Screening, Diagnosis, and Treatment ("EPSDT") program, under which federal law requires that states offer a broad scope of Medicaid services through age 21.  Gershon Decl. at ¶ 14. Under this program, children receive in-home nursing and other services pursuant to a physician-signed Plan of Treatment, but because EPSDT is not capped, they are not subject to cost limits.  *Id.*  When these children become 21-years old and no longer qualify for EPSDT, they apply for the Waiver to continue receiving in-home nursing and/or attendant care, and, although their care needs haven't changed, they experience a drastic reduction in services due to the cost limits.  *Id.*

For example, Diane Frank's daughter, S., will turn 21 on August 21, 2016. Declaration of Diane Frank ("Frank Decl.") at ¶ 2.  S.'s disabilities include global developmental delays, including deaf-blindness and cerebral palsy.  *Id.* at ¶ 3.  She is not able to talk or walk, and has a seizure disorder. *Id.*  She receives nutrition through a feeding tube. *Id.* S. has received 45 hours per week of in-home nursing funded through EPSDT for 17 years for her complex care needs, including autonomic dysreflexia, which can cause unpredictable spikes in blood pressure leading to acute episodes that, if not

5

immediately identified and treated, can cause death.  *Id.* ¶¶ 4-5. In March, 2016, Ms. Frank was informed by DHCS that when her daughter turns age 21, her Medi-Cal funded nursing will be cut by more than 75 percent to 44 hours per <u>month</u> in order to maintain her services within the Waiver cost limit for her level of care.  *Id.* at ¶¶ 21-22.  She did not receive a Notice of Action to appeal this determination.  *Id.* at ¶ 21.

Other callers face reductions in their Waiver services due to increases in IHSS wages. Gershon Decl. ¶ 14.  One such example is Waiver participant Mark Chambers. Declaration of Sarah McKinney ("McKinney Decl.") at ¶¶ 6-9.  Mr. Chambers has been a Waiver participant since 2010.  *Id.* at ¶ 8.  Mr. Chambers has had two traumatic brain injuries which resulted in a seizure disorder and affected his mobility and speech.  *Id.* at ¶ 7.  Mr. Chambers resided at Laguna Honda Hospital in San Francisco for 10 years before moving to his own apartment with Waiver services and IHSS.  *Id.* at ¶¶ 8, 11.  In June, 2016, his care management agency, Toolworks, sought to increase Mr. Chambers' attendant care hours since he was having difficulty finding overnight care.  *Id.* at ¶ 13.  When Toolworks staff spoke with DHCS, she was informed that Mr. Chambers' Waiver services would be subject to reassessment because the IHSS wage rate has increased.  *Id.* at ¶ 16.  After conferring with DRC and contacting DHCS, Toolworks staff was not told that Mr. Chambers' services would remain the same or that Mr. Chambers could ask for an exception to the cost limits; rather, she was told that while Waiver participants have some flexibility in choosing with Waiver services they receive, they cannot receive services over the cost limits.  *Id.* at ¶¶ 17-23.  Toolworks has not received a definitive answer from DHCS about whether Mr. Chambers' Waiver services will be reduced; he remains without adequate care to meet his needs and subject to a reduction which could jeopardize his ability to live in the community.  *Id.* at ¶¶ 25-26.

Other callers have had tracheostomies removed, thereby changing their level of care and their cost limit, even though their care needs have not diminished significantly or at all. Gershon Decl. at ¶ 14.  As a result of DRC intervention, some of the cases of individuals facing reductions are "on hold" but the callers wait in limbo and in fear for

6

1   their next reassessment and of receiving a notice of reduction of their Waiver services.

2   *Id.* at ¶ 15.

3   **III.    ARGUMENT**

4   **    A.    The Ninth Circuit Disfavors Stays for Cases that Are Anticipatorily**

5   **        Moot**

6       The seminal Supreme Court decision in *Landis v. North American. Co.*, 299 U.S.

7   248, 255 (1936), affirmed the inherent power of the district court to stay proceedings, but

8   cautioned that "the suppliant for a stay must make out a clear case of hardship or

9   inequity in being required to go forward, if there is even a fair possibility that the stay for

10  which he prays will work damage to someone else."

11      Defendants ignore the body of law the Ninth Circuit has developed through

12  decisions where, as here, it is claimed or anticipated that an event that has yet to occur

13  "will definitively moot this case." Mot. to Stay (ECF No. 175) at 11:22.  In *Hunt v.*

14  *Imperial Merchant Services, Inc.*, 560 F.3d 1137, 1142 (9th Cir. 2009), the court

15  described the case as "anticipatorily moot," because a  decision on the merits could

16  render moot the issue at hand – which party was responsible for paying for the costs of

17  notifying the class.  Because the case presented an issue that "often arises in district

18  courts but typically evades appellate review," the court held that the case was justiciable,

19  concluding "we are not required to dismiss a live controversy as moot merely because it

20  may become moot in the near future." *Id.*

21      The *Hunt* notion of "anticipatory mootness" has subsequently been applied and

22  refined in several cases involving motions to stay.  In *Defenders of Wildlife v. Hall*, No.

23  CV 08–14–M–DWM, 2011 WL 1740312, at *1 (D. Mont. May 4, 2011), the court

24  denied defendants' motion to stay on the grounds that the case would become moot after

25  an "anticipated" Secretary of the Interior action, holding "[j]udicial economy and the

26  parties' resources will not be conserved by delaying a ruling on the fully briefed and

27  argued motions for summary judgment." *Accord*, *Conservation Law Found. v. Pritzker*,

28  37 F. Supp. 3d 254, 264-65 (D.D.C. 2014), *appeal dismissed sub nom*; *see also*

7

*Conservation Law Found. v. Natl. Oceanic and Atmospheric Admin.*, No. 14-5135, 2014 WL 4627848 (D.C. Cir. July 24, 2014) (stay was denied where "injunction would undoubtedly 'have some effect in the real world'); *Conservation Council for Hawaii v. Natl. Marine Fisheries Serv.*, 97 F. Supp. 3d 1210, 1231 (D. Haw. 2015) (stay denied because "this court is not required to dismiss or stay a live controversy simply because it may become moot in the future"); *Alliance for the Wild Rockies v. Marten*, CV-15-99-M-BMM, ___F. Supp. 3d____, 2016 WL 4069866, at *2 (D. Mont. July 27, 2016) (stay denied because court "should not render an action moot when a declaratory judgment could provide effective relief, even when injunctive relief may be rendered moot during litigation.").

    Application of this body of law to the case at hand dictates denial of Defendants' motion to stay.  As an initial matter, Defendants complain that, "[i]f the court does not grant a stay… it will cause Defendants inequity and hardship, because they will be forced to prepare for, and potentially litigate, a trial for a case that is highly likely to be moot in the near future . . ." Mot. to Stay at 2:6-9.  But as the Ninth Circuit found in a case upon which Defendants rely, "being required to defend a suit, without more, does not constitute a 'clear case of hardship or inequity' within the meaning of *Landis*." *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1112 (9th Cir. 2005).  And, as this Court found in *California Trout, Inc. v. U.S. Bureau of Reclamation*, 115 F. Supp. 3d 1102, 1117 (C.D. Cal. 2015), when Plaintiffs could be harmed by a stay, "[r]elief by this court may assure that these incidents are taken seriously, and addressed adequately." To stay this case now, after Plaintiffs' summary judgment motion has been briefed **two—soon to be three-- times** and is ripe for hearing would be a grave injustice to Plaintiffs and others who continue to need legal relief.

    Particularly unfair is the fact that Defendants have, in effect, unilaterally granted themselves a five-month stay through their obstructionist tactics and refusal to comply with their discovery obligations even when ordered by the Court to do so.  *Tinsley v. Kemp,* 750 F.Supp. 1001, 1013 (W.D. Mo. 1990) ("[B]y refusing to comply with

8

discovery merely because a motion to stay is pending, a party effectively is granting its own motion to stay-even before the court has ruled. Such a phenomenon would reduce a court's orders to useless and senseless formalities."). Plaintiffs already have suffered inequity because of Defendants' conduct and are entitled to proceed with their case.

## B. This Case Will Not "Definitely Be Moot," Contrary to Defendants' Claims.

Since neither the Waiver Amendment nor the Waiver Renewal would eliminate the cost limits or materially change them in any way that Defendants have disclosed, and because Plaintiffs' case is not currently moot, the bold assertion that this case will "definitely be moot" (Mot. to Stay at 11:19-21) is unavailing. Even if all of Plaintiffs' demands had been met, however, this case is not moot because it is only a recent, voluntary, and temporary change to their illegal policies and practices and capable of repetition, but evading review.

### 1. Defendants Cannot Overcome The "Heavy Burden" To Prove That Claims Are Moot After Voluntary Cessation Of Illegal Behavior.

Recently, the Ninth Circuit enumerated the factors to be weighed when a governmental defendant claims that its voluntary cessation of illegal activity moots plaintiff's claims:

> We have not set forth a definitive test for determining whether a voluntary cessation of this last type—one not reflected in statutory changes or even in changes in ordinances or regulations—has rendered a case moot. But we have indicated that mootness is more likely if (1) the policy change is evidenced by language that is "broad in scope and unequivocal in tone," *Id.* at 1243; (2) the policy change fully "addresses all of the objectionable measures that [the Government] officials took against the plaintiffs in th[e] case", *id.*; (3) "th[e] case [in question] was the catalyst for the agency's adoption of the new policy," *id.*; (4) the policy has been in place for a long time when we consider mootness, *see id.* at 1243–44 & nn. 25, 27; and (5)

9

1    "since [the policy's] implementation the agency's officials have not engaged

2    in conduct similar to that challenged by the plaintiff[ ]," *id.* at 1243.

3    *Rosebrock v. Mathis*, 745 F.3d 963, 972, (9th Cir. 2014) *cert. denied sub nom.*

4    *Rosebrock v. Hoffman*, 135 S.Ct. 1893 (2015), citing *White v. Lee,* 227 F.3d 1214, 1243-

5    44 (9th Cir. 2000).

6        Even a government agency bears the "heavy burden" of showing that it will not

7    resume its conduct. *Bell v. City of Boise*, 709 F.3d 890, 898-99 (9th Cir. 2013). When the

8    agency defends the legality of its conduct and does not say it plans a permanent change

9    in its policy, plaintiffs' claims are not moot.  *Parents Involved in Cmty. Sch. v. Seattle*

10   *Sch. Dist. No. 1*, 551 U.S. 701, 719, 127 S. Ct. 2738, 2751 (2007) (school district did not

11   sustain "heavy burden" when it "vigorously defend[ed] the constitutionality of its race-

12   based program, and nowhere suggest[ed] that if this litigation is resolved in its favor it

13   will not resume using race to assign students.").

14       DHCS' purported future voluntary cessation fails the Ninth Circuit's mootness

15   test, because it  is unilateral, informal, temporary, undefined and in the middle of this

16   litigation. As discussed above, *supra* Section II.A, neither the Waiver Amendment nor

17   the Waiver Renewal are in effect, nor will they "eliminate" the Waiver cost limits as

18   Defendants assert.  Thus, there is no policy change, let alone one that meets the specific

19   factors above.  "Courts considering whether voluntary cessation moots a claim often

20   look for a change in official policy or law, or some other external constraint on the

21   defendant's action, such as a collateral court order…In the absence of such a constraint,

22   'when a defendant retains the authority and capacity to repeat an alleged harm, a

23   plaintiff's claim should not be dismissed as moot.'"  *Davison v. Plowman*, No. 1:16-CV-

24   0180, 2016 WL 3167394, at *4 (E.D. Va. June 6, 2016), quoting *Wall v. Wade*, 741 F.3d

25   492, 497 (4th Cir. 2014).  Moreover, Defendants continue to vigorously defend the

26   legality of their practices--further evidence that their supposed change in policy may be

27   reversed.

28

1    Defendants also rely on their mid-litigation and temporary authorization of Waiver

2    services over the cost limits to Plaintiffs, ignoring the fact that they have not authorized

3    all of the services that Plaintiffs need and that they have refused to make long-term

4    commitments to Plaintiffs.  *See* Gershon Decl. at ¶ 16; Schupp Decl. February 26, 2016

5    (ECF No. 176) at ¶ 28 7:22-27.  Where, as here, Defendants rely on the "theoretical"

6    availability of services to Plaintiffs through the Waiver Amendment, Waiver Renewal or

7    other, unspecified means, they have not satisfied their obligations under the ADA's

8    integration mandate.  *Brantley v. Maxwell-Jolly,* 656 F. Supp. 2d 1161, 1174 (N.D. Cal.

9    2009) (Court preliminarily enjoined cutbacks to California's Adult Day Health Care

10   Medi-Cal program, finding that Defendants DHCS and its Director had failed to ensure

11   that alternative services would be in place to prevent Plaintiffs' risk of harm including

12   institutionalization, stating, "to the extent that Defendants are claiming that alternative

13   services satisfy their obligation under the integration mandate, Defendants certainly bear

14   the burden of ensuring more than a 'theoretical' availability of such services.").

15   The Department of Justice discussed at length the deficiencies in Defendants'

16   Waiver and has filed a Supplemental Statement of Interest explaining why it does not

17   believe that the Waiver Amendment or hypothetical Waiver Renewal  change its analysis

18   that Defendants' approach to waiver violates the ADA:

19   Defendants' narrow focus on the steps the State can take to remove the

20   individual cost limits from the current Waiver ignores the steps it could take

21   to otherwise comply with the ADA, including by example using state-only

22   dollars to fund services in excess of the currently applicable cost limits.

23   *See, e.g.*, SOI at 6, n. 9 (noting that the State intended "to use state-only

24   dollars to fund Waiver costs over individual cost limits attributable to [In-

25   Home Supportive Services] and [Waiver Personal Care Services] overtime

26   rather than reduce services to Waiver participants.") (second alteration in

27   original).  Moreover, Defendants' narrow focus on the steps the state can

28   take to remove the individual cost limits from the current Waiver ignores

11

the legal reality that federal approval of the proposed amendment will not

necessarily bring the State into compliance with the ADA.  SOI at 2, n.4.

Absent establishing a fundamental alteration defense, see SOI at 4, n.7, with

or without an amended Waiver the State must operate its service system in a

manner which ensures that, on an individual level, "services will be

identified and in place for Plaintiffs" to avoid needless institutionalization.

SOI at 5:16-6:4 (citing *Brantley*, 656 F. Supp. 2d at 1174 and *V.L. v.*

*Wagner*, 669 F. Supp. 2d 1106, 1122 (N.D. Cal. 2009)).

DOJ Suppl. Statement (ECF No. 171) at 2:1-16.

The mere fact that Defendants' proposed Waiver amendment includes a discretionary second level of review as part of its service authorization process (*see* Schupp Decl. July 8, 2016 Ex. A (June 27 Proposed Waiver Amendment Appl.) at DHCS 18328), without more, does not remedy their ADA violations on a systemic basis, particularly when their initial evaluation and subsequent revaluations continue to rely on the cost limits established in 2007.

Indeed, Rebecca Schupp admitted in sworn deposition testimony on May 27, 2016 that the following important procedures "ha[ve] not been determined at this time" by DHCS as to this purported second level of review:

- Whether to inform medical consultants (second-level reviewers) that the "cost limits" for waiver services at different levels of care set forth in the Waiver Amendment are actually "cost amounts";

- Whether to inform medical consultants that the cost amounts are not determined by an individual's risk of institutionalization;

- Whether to inform medical consultants that there is no upper cost limit on services provided to a waiver participant so long as the services are medically necessary;

- Whether medical consultants can exercise independent judgment as to whether waiver services are medically necessary.

12

1    Schupp Dep. May 27, 2016 at 31:6-33:7.

2         Defendants provide no evidence that DHCS has resolved how the essential

3    workings of the second level of review will enable DHCS to administer the Waiver

4    program without using individual cost limits. And the little that has been shared about

5    the Waiver Renewal tells us that "individual cost limits" will persist after December 31.

6    Schupp Decl. July 8, 2016 Ex. B (Waiver Renewal Summary) (ECF No. 177-4) at

7    DHCS16786.  So, the notion that DHCS has replaced the individual cost limit structure

8    with a structure to fairly and properly assess a Waiver participant's need for services

9    based only on medical necessity is all the more illusory.

10        2.    Plaintiffs' Claims Fall within the "Capable of Repetition Yet Evading
              Review" Exception to the Mootness Doctrine.
11

12        Courts must rule a case is not moot if 1) the actionable conduct is too short in

13   duration to be litigated to completion prior to its expiration; and 2) plaintiffs can

14   reasonably expect to suffer the same actionable conduct again.  *Federal Election*

15   *Commission v. Wisconsin Right to Life, Inc.,* 551 U.S. 449, 127 S.Ct. 2652 (2007). Thus

16   in the very case that is the foundation of the waiver program in which plaintiffs are

17   enrolled, *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 594, 119 S.Ct. 2176, 2184

18   (1999), the Supreme Court noted: "[Plaintiffs] L.C. and E.W. are currently receiving

19   treatment in community-based programs. Nevertheless, the case is not moot.  As the

20   District Court and Court of Appeals explained, in view of the multiple institutional

21   placements L.C. and E.W. have experienced, the controversy they brought to court is

22   'capable of repetition, yet evading review.'"

23        In the present case, Defendants acknowledge in their letters and declarations in

24   support of their motion to stay that Plaintiffs will be subject to continuing review and

25   evaluation.  ("It is impossible for the Department to make long-term, indefinite

26   commitments to individual participants, including Plaintiffs, regarding the exact services

27   they will receive, and under what program they will receive such services."). Schupp

28   Decl. Feb. 26, 2016 (ECF No. 176) at ¶ 28, 7:22-27.  Since there is no question that

13

Plaintiffs' services authorization will be subject to continuous review, the "capable of repetition" prong of this test is satisfied.

Defendants admit that Plaintiffs must submit a new Plan of Treatment every 180 days and that Plaintiffs may be subject to new rules and standards after December 2016. As a practical matter, then, the wrongful behavior alleged in this lawsuit will evade review. *See Greenpeace Action v. Franklin*, 14 F.3d 1324, 1329 (9th Cir.1993) (one year); *Alaska Ctr. for the Env't v. U.S. Forest Serv.,* 189 F.3d 851, 855 (9th Cir.1999) (two years); *A.D. ex rel. L.D. v. State of Hawaii Dept. of Ed*., 727 F3d 911, 914 (9th Cir. 2013) (2 years). Not until a year after Plaintiffs filed this lawsuit did they receive any services over the cost caps. Their continuing vulnerability is underscored by Defendants' refusal to admit that their conduct and policies violate the ADA, Section 504 of the Rehabilitation Act, Government Code § 11135 and due process.

In addition, Defendants' argument that "Plaintiffs should utilize the administrative process to raise issues of medical necessity" (Mot. to Stay at 20:19-20) and that there is a "robust" administrative process (Mot. to Stay 21:2) is disingenuous at best. As Defendants well know, Plaintiffs have sought relief through the administrative process to no avail. That is why they filed this lawsuit.

## IV.  CONCLUSION

As shown above, Plaintiffs' claims clearly are not moot, nor will they be moot, under any theory. Defendants are gaming Plaintiffs and the Court in their latest attempt to stymie resolution of Plaintiffs' claims on their merits. The legal maxim "justice delayed is justice denied" is particularly apt here, and Defendants' motion to delay justice once again should be denied.

Dated: August 18, 2016                   Respectfully submitted,

                                          DISABILITY RIGHTS CALIFORNIA
                                          WESTERN CENTER ON LAW AND POVERTY
                              By:         _____/s/_____
                                          Elissa Gershon
                                          Attorneys for Plaintiffs

14