Elissa Gershon, State Bar No. 169741
Elissa.Gershon@disabilityrightsca.org
Anne Hadreas, State Bar No. 253377
Anne.hadreas@disabilityrightsca.org
DISABILITY RIGHTS CALIFORNIA
1330 Broadway, Suite 500
Oakland, CA  94612
Telephone:  (510) 267-1200
Fax:  (510) 267-1201
[Additional Counsel on following page]

Attorneys for Plaintiffs JERRY THOMAS,
SEAN BENISON, and JUAN PALOMARES

KAMALA D. HARRIS
Attorney General of California
JENNIFER M. KIM
Supervising Deputy Attorney General
KENNETH K. WANG, State Bar No. 201823
Deputy Attorney General
MICHAEL T. GUITAR, State Bar No. 281085
Deputy Attorney General
300 S. Spring Street, No. 1702
Los Angeles, CA 90013
Telephone:  (213)-897-2451
Fax:  (213) 897-2805
Kenneth.wang@doj.ca.gov

Attorneys for Defendants JENNIFER KENT and CALIFORNIA DEPARTMENT OF HEALTH CARE SERVICES

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JERRY THOMAS, et al. | Case Number: 14-CV-08013-FMO(AGRx) |
| Plaintiff(s), | **PARTIES' JOINT MEMORANDUM OF POINTS AND AUTHORITIES RE: PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, FOR AN ORDER TREATING SPECIFIED FACTS AS ESTABLISHED; AND DEFENDANTS' OPPOSITION THERETO** |
| vs. | |
| JENNIFER KENT, et al. | |
| Defendant(s). | |
| | Courtroom:   22, 5th Floor |
| | Judge:          Hon. Fernando M. Olguin |
| | Trial Date:    November 29, 2016 |
| | Action Filed:  October 16, 2014 |

i

Betsy Havens, State Bar No. 296842
Betsy.Havens@disabilityrightsca.org
Marilyn Holle, State Bar No. 61530
Marilyn.Holle@disabilityrightsca.org
DISABILITY RIGHTS CALIFORNIA
350 South Bixel Street, Suite 290
Los Angeles, California 90017
Telephone: (213) 213-8000
Fax: (213) 213-8001

Robert D. Newman, State Bar No. 86534
rnewman@wclp.org
Mona Tawatao, State Bar No. 128779
mtawatao@wclp.org
Sue Himmelrich, State Bar No. 110664
shimmelrich@wclp.org
WESTERN CENTER ON LAW AND POVERTY
3701 Wilshire Boulevard, Suite 208
Los Angeles, CA 90010-2826
Telephone: (213) 487-7211
Facsimile: (213) 487-0242

**TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................. 1

   A.   Plaintiffs' Introduction ................................................ 1

   B.   Defendants' Introduction .............................................. 3

II.   STATEMENT OF FACTS .................................................. 4

   A.   Medi-Cal and IHSS ...................................................... 4
     1.   Plaintiffs' Statement ............................................ 4
     2.   Defendants' Statement .......................................... 5

   B.   The NF/AH Waiver Program and Defendants' Cost Limits ......... 5
     1.   Plaintiffs' Statement ............................................ 5
     2.   Defendants' Statement .......................................... 9

   C.   Implementation of Defendants' Individual Cost Limit ........... 12
     1.   Plaintiffs' Statement .......................................... 12
     2.   Defendants' Statement ........................................ 14

   D.   Individual Plaintiffs ................................................... 15
     1.   Plaintiffs' Statement - Jerry Thomas ...................... 15
     2.   Defendants' Statement – Jerry Thomas ................... 17
     3.   Plaintiffs' Statement - Sean Benison ...................... 20
     4.   Defendants' Statement – Sean Benison ................... 21
     5.   Plaintiffs' Statement - Juan Palomares ................... 23
     6.   Defendants' Statement – Juan Palomares ................ 24
     7.   Plaintiffs: – Oct. 7, 2015 Letters to Plaintiffs and Subsequent Actions ........................................... 25
     8.   Defendants – Oct. 7, 2015 Letters to Plaintiffs and Subsequent Actions ........................................... 27

   E.   Despite Its Ad Hoc Exceptions, DHCS Has Not Changed Its Cost Limit Policies, Thereby Harming People with Disabilities ........ 27
     1.   Plaintiffs' Statement .......................................... 27
     2.   Defendants' Statement ........................................ 28

III.   STATEMENT OF THE LAW ........................................... 29

   A.   Pltfs.' Argument: The ADA, Section 504, and Gov't Code Section 11135 Prohibit Discrimination Against Individuals with Disabilities ........ 29

   B.   Plaintiffs' Argument:  DHCS' Imposition of Arbitrary and Illegal Cost Limits Violates Prohibitions Against Unjustified and Unnecessary

|  |  |  | Institutionalization. ................................................................... 30 |

| | C. | | **Defendants' Response: The Department Is Not in Violation of the Integration Mandate** ................................................................... 33 |
| | | 1. | Plaintiffs' Claim Is Moot ...................................................... 34 |
| | | 2. | Plaintiffs are Not at "Serious Risk" of Institutionalization, Because They are Authorized for All Medically Necessary Services to Remain Safe in Their Homes ................................................................................ 35 |
| | | 3. | There Is No Evidence of Any Risk of Any Future Institutionalization ................................................................ 36 |
| | | 4. | Plaintiffs' Criticisms of the Waiver Amendment Is Yet Another Example of the Material Facts in Dispute. ............... 40 |
| | | 5. | There Is No Evidence that Anyone Was or Will Be Disenrolled from the Waiver Because of the Individual Cost Limits ........................................................................... 41 |
| | | 6. | Plaintiffs' Reliance on *Radaszewski* and *Townsend* is Misplaced .............................................................................. 41 |

| | D. | | **Plaintiffs' Argument: Defendants' Discriminatory Actions Further Violate the ADA, Placing Plaintiffs and Others at Risk of Institutionalization** .............................................................. 42 |

| | E. | | **Defendants' Response: The Department Does Not Employ Methods of Administration that Result in Discrimination** .......................... 44 |
| | | 1. | The Department Has Neither Discriminated Against Plaintiffs Nor Placed Anyone at Risk of Institutionalization ................................................................ 44 |
| | | 2. | The Department Has Not Defeated or Substantially Impaired the Purpose of the NF/AH Waiver Program ............. 45 |
| | | 3. | Plaintiffs' Reliance on the Claims of "Others" is Irrelevant ............................................................................ 46 |

| | F. | | **Defendants Have Violated Plaintiffs' Due Process Rights under the 14th Amendment as a Matter of Law.** ...................................... 47 |
| | | 1. | Plaintiffs' Argument ............................................................. 47 |
| | | 2. | Defendants' Response ........................................................... 49 |

| IV. | | | **CONCLUSION** .................................................................................. 50 |
| | | 1. | Plaintiffs' Conclusion ........................................................... 50 |
| | | 2. | Defendants' Conclusion ........................................................ 50 |

1

# TABLE OF AUTHORITIES

2

**Cases**

3

*Baker-Chaput v. Cammett*
406 F. Supp. 1134 (D.N.H. 1976). ........................................................ 48

*Biodiversity Legal Foundation v. Badgley*
309 F.3d 1166 (9th Cir. 2002) ............................................................... 34

*Brantley v. Maxwell-Jolly*
656 F. Supp. 2d 1161 (N.D. Cal. 2009). ............................................... 30

*Cruz v. Dudek*
2010 WL 4284955, at *3 (2010) ............................................................ 36

*David v. Romney*
490 F.2d 1360 (3d Cir. 1974) ................................................................ 46

*Friends of the Earth, Inc. v. Bergland*
576 F.2d 1377 (9th Cir. 1978) ............................................................... 34

*Gator.com Corp. v. L.L. Bean, Inc.*,
398 F.3d 1125 (9th Cir. 2005) ............................................................... 34

*Green v. Branson*
108 F.3d 1296 (10th Cir. 1997) ............................................................. 35

*Grisham v. Philip Morris, Inc.*
670 F. Supp. 2d 1014 (C.D. Cal. 2009) ................................................ 49

*Guggenberger v. Minnesota*
CV 15-3439 2016 WL 4098562, at *7 (D. Minn. July 28, 2016) ......... 33

*K.W. ex rel. D.W. v. Armstrong*
789 F.3d 962 (9th Cir. 2015) .......................................................... 48, 49

*K.W. v. Armstrong*
No. 1:12-cv-00022, 2016 WL 1254225, at *8 (D. Idaho Mar. 28, 2016) ............. 48

*Kaplan v. Rose*
49 F.3d 1363 (9th Cir. 1994) ................................................................ 49

*M.R. v. Dreyfus*
697 F.3d 706 (9th Cir. 2012) .......................................................... 30, 46

*Martinez v. Ibarra*
759 F. Supp. 664 (D. Colo. 1991) ........................................................ 48

*Maryland Casualty Co. v. Pacific & Oil, Co.*,
61 S. Ct. 510 (1941) .............................................................................. 34

*McMichael v. Napa Cty.*,
709 F.2d 1268 (9th Cir. 1983) ......................................................... 45, 46

*McQuillion v. Schwarzenegger*
369 F.3d 1091 (9th Cir. 1991) .............................................................. 35

*N.B. ex rel. Peacock v. District of Columbia*
794 F.3d 31 (D.C. Cir. 2015) ............................................................... 48

*Olmstead v. L.C.*
     527 U.S. 581 (1999) ............................................................. 2, 31
*Olmstead v. L.C. ex rel. Zimring*
     527 U.S. 581 (1999) ................................................................ 10
*Radaszewski ex rel. Radaszewski v. Maram*
     383 F.3d 599 (7th Cir. 2004) ................................................ 31
*Radaszewski ex rel. Radaszewski v. Maram*
     No. 01 C 995, 2008 WL 2097382 at *15 (N.D. Ill. Mar. 26, 2008) .................... 31
*Ray Charles Found v. Robinson*
     795 F.3d 1109 (9th Cir. 2015) .......................................... 45, 46
*Sanchez v. Johnson*
     416 F.3d 1051 (9th Cir. 2005) .............................................. 12
*Smith v. Goguen*
     415 U.S. 566 (1974). ........................................................ 48
*Steimel v. Wernert*
     15-2389, 2016 WL 2731505 at *1 (7th Cir. May 10, 2016). ............... 6
*The Arc of Washington State Inc., v. Braddock*
     427 F.3d 615 (9th Cir. 2005) .............................................. 12
*Townsend v. Quasim*
     328 F.3d 511 (9th Cir. 2003) .......................................... 31, 42
*Warth v. Seldin*
     422 U.S. 490 (1975) ..................................................... 45, 46
*West v. Sec'y of the Dep't of Transp.*
     206 F.3d 920 (9th Cir. 2000). ............................................. 34
*Zepeda v. INS*
     753 F.2d 719 (9th Cir. 1985) .............................................. 46

**Federal Statutes**

29 U.S.C. § 705(20) ....................................................................... 29
29 U.S.C. §§ 794-794a ..................................................................... 3
42 U.S.C. § 12101(a)(2) ................................................................... 30
42 U.S.C. § 12101(a)(5) ................................................................... 30
42 U.S.C. § 12101(b)(1) ................................................................... 30
42 U.S.C. § 12131 ......................................................................... 29
42 U.S.C. § 12132 ......................................................................... 29
42 U.S.C. § 1320d ......................................................................... 48
42 U.S.C. § 1396-1 ......................................................................... 5
42 U.S.C. § 1396b ......................................................................... 7
42 U.S.C. § 1396b ......................................................................... 6
42 U.S.C. § 1396n(c)(1) ............................................................... 7, 11
42 U.S.C. § 1396n(c)(2)(D) ............................................................... 11
42 U.S.C. §§ 12101(a)(3) ................................................................. 30

42 U.S.C. §§ 12101-12213 ...................................................................................... 3

**State Statutes**

Cal. Gov't Code § 11135 ................................................................................... 3, 36
Cal. Gov't Code § 11135(b ..................................................................................... 28
Cal. Gov't Code § 11139 ......................................................................................... 36
Code Civ. Proc. § 1094.5 ........................................................................................ 42
Health and Safety Code § 1276.5 ........................................................................... 40
Welf. & Inst. Code § 14059.5 ............................................................................ 5, 35
Welf. & Inst. Code § 14133.3 ................................................................................... 5
Welf. and Inst. Code § 10950 ................................................................................. 42
Welf. and Inst. Code § 12300 ............................................................................... 5, 6
Welf. and Inst. Code § 12300.4 .............................................................................. 13
Welf. and Inst. Code § 1400 ..................................................................................... 6
Welf. and Inst. Code § 14059 ................................................................................... 6
Welf. and Inst. Code § 14059.5 ................................................................................ 6
Welf. and Inst. Code § 14126.022(f)(1) .................................................................. 40
Welf. and Inst. Code § 14132.95 ......................................................................... 5, 6
Welf. and Inst. Code § 14133.3 ................................................................................ 6

**Federal Regulations**

28 C.F.R. § 35.130(b)(7).......................................................................................... 28
28 C.F.R. § 35.130(b)(8).......................................................................................... 42
28 C.F.R. § 35.130(d) .............................................................................................. 29
42 CFR § 441.301(b)(6)............................................................................................. 4
42 CFR § 441.304(f) .................................................................................................. 4
45 C.F.R. § 84.4(b)(1)(iv)........................................................................................ 42

**State Regulations**

Cal. Code Regs, tit. 22, § 51003 ............................................................................. 14
Cal. Code Regs. tit. 22 § 50004 ................................................................................ 6
Cal. Code Regs. tit. 22 § 50951(a)........................................................................... 42

**Federal Rules**

Fed. R. Civ. P. 23(b)(3) ........................................................................................... 45
Fed. R. Civ. P. 56(a) ................................................................................................ 33

*JERRY THOMAS ET AL. V. JENNIFER KENT, DHCS;* 14-CV-08013 FMO (AGRx)

# I.   INTRODUCTION

## A.   Plaintiffs' Introduction

There is no genuine dispute over the material facts in this case. The Nursing Facility/Acute Hospital Home and Community-Based Services Waiver ("NF/AH Waiver" or "Waiver") is intended to provide in-home services for Medicaid recipients with disabilities who qualify for placement in nursing facilities and other institutions. Plaintiffs Jerry Thomas, Sean Benison, and Juan Palomares all have significant physical disabilities and were institutionalized but now live in their own homes with Medicaid-funded nursing and attendant care provided pursuant to the NF/AH Waiver. It is undisputed that each Plaintiff requires nursing and/or personal attendant care 24 hours per day to remain safely at home and that each was denied the services he needed to remain safely at home due to Waiver cost limits imposed by Defendant California Department of Health Care Services ("DHCS").

One year after this lawsuit was filed, DHCS finally authorized services over the cost limits to Plaintiffs, but has still refused to approve all of the services recommended by their doctors.  DHCS has also not changed its written policies or developed standards to ensure that Plaintiffs and others are not denied needed services due to the Waiver cost limits.  Plaintiffs seek injunctive and declaratory relief from this Court requiring Defendants to take steps to ensure that Plaintiffs and others can get the services they need to remain safely at home as a matter of law.

DHCS has chosen to set individual annual Waiver cost limits for home based care significantly below what DHCS pays for comparable institutional care. The Waiver cost limits have not increased since 2007, while rates to institutions have increased each year. Plaintiffs have established that Defendants arbitrarily authorize services above the individual cost limits for some Waiver participants. Defendants acknowledge, however, that there are no written policies or procedures governing authorizations for ongoing services such as nursing or attendant care that exceed the cost limits, nor are Waiver participants informed that they may request and receive an exception to their individual

cost limit if they need it to remain safely at home.  Indeed, in May 2016, Governor Brown candidly informed the Legislature that "the cost neutrality requirements are applied individually to each NF/AH Waiver participant therefore limiting access to critically needed services and risking unnecessary institutionalization on a case by case basis."  [P90.1]; Pls.' Ex. 77 (May Revise).

In *Olmstead v. L.C.,* 527 U.S. 581, 597 (1999), the Supreme Court held that the "integration mandate" of the Americans with Disabilities Act ("ADA") prohibits the unjustified segregation of people with disabilities in institutions. Rejecting Defendants' arguments that Plaintiffs' ADA claims should be defeated because of DHCS' *ad hoc* authorization of exceptions to the cost limits, the United States Department of Justice recently stated to this Court, "[a]n opaque and unwritten [exception] policy…implemented without an effort by Defendants to track its use…and triggered for these Plaintiffs only after a year of litigation in federal court,…does not 'ensure' that individuals who require additional care to remain in the community will have the necessary alternative services identified and put in place to avoid unnecessary institutionalization." DOJ Statement of Interest ("SOI") (ECF No. 112) at 6:13-17 (citations omitted).  Defendants' practices also violate the ADA's prohibitions on discriminatory "methods of administration" and eligibility criteria that screen out people with disabilities from their programs. Finally, Defendants' "standardless administration" of the Waiver runs afoul of Constitutional due process protections. DHCS' recent attempts to amend and renew the Waiver do not cure any of these illegal practices.[1]

Based on uncontroverted evidence, this Court should grant summary judgment for Plaintiffs and declare that Defendants' administration of the NF/AH Waiver violates the ADA (42 U.S.C. §§ 12101-12213), Section 504 of the Rehabilitation Act of 1973 ("Section 504") (29 U.S.C. §§ 794-794a), California Government Code section 11135

---

[1] In their Supplemental Statement of Interest, the DOJ puts to rest any lingering issues of mootness based on the intended Waiver Amendment or Renewal, clarifying "the legal reality that federal approval of the proposed amendment will not necessarily bring the State into compliance with the ADA" DOJ Supp. SOI [ECF No. 171] at 2:9-10.

(Cal. Gov't Code § 11135), and the due process rights of Plaintiffs and others under the 14th Amendment to the United States Constitution. Plaintiffs request that this Court order Defendants to comply with the ADA and other anti-discrimination statutes by taking necessary steps to ensure that Plaintiffs and others are not placed at risk of unnecessary institutionalization in their administration of the NF/AH Waiver.

## B.    Defendants' Introduction

This motion for summary judgment (MSJ), or in the alternative, for partial summary judgment of claims and defenses (collectively, the Motion) should be denied because there are material facts in controversy and the case is moot. On mootness, Plaintiffs seek authorization of the medically necessary Waiver services regardless of the current Waiver's cost limits.  In that regard, Defendant Department of Health Care Services (Department) has already done all that it can do to address the cost limit issue:

- The Department has stated that Plaintiffs can receive all medically necessary waiver services without regard to the cost limits.

- The Department has submitted a proposed Waiver amendment allowing participants to receive medically necessary Waiver services without any cost limits. The proposed amendment is being reviewed by the Centers for Medicare & Medicaid Services (CMS), and must be approved by CMS to be effective.

- The current Waiver expires on December 31, 2016. The Department is at this very moment in the process of renewing the NF/AH Waiver in accordance with an extensive public input process required by federal law. (42 CFR § 441.301(b)(6) and 441.304(f).) The Waiver renewal proposal also eliminates the individual cost limits.

With regard to the material facts in dispute, there is clearly a dispute as to whether there is any violation of the ADA and the Rehabilitation Act; specifically, whether Plaintiffs are at any serious risk of institutionalization, given the fact that they are and will continue to be authorized medically necessary Waiver services to remain safely in

3

1  their homes during the life of the Waiver.  Contrary to Plaintiffs' claim, the evidence

2  shows that Plaintiffs have been consistently residing safely in their homes and the

3  community with the assistance of the NF/AH Waiver and other services and supports.

4  Plaintiffs' assertion that they were denied the services needed to remain safely at home is

5  simply not true and is absolutely disputed.

6        Finally, Plaintiffs' newly asserted Due Process Claim cannot be considered as a

7  basis for this motion.  Plaintiffs cannot be permitted to amend their Second Amended

8  Complaint (SAC) at this late stage in the case, as part of a dispositive motion, without

9  allowing Defendants any discovery on the claim. Allowing such an amendment would

10  severely prejudice Defendants.  Further, Plaintiffs have had plenty of opportunity to

11  formally amend their complaint, but chose not to do so—rather, for the third time, they

12  attempt to avoid the formal pleading requirements and stick it in their motion for

13  summary judgment.  Such blatant disregard for the rules should not be tolerated.

14  **II.    STATEMENT OF FACTS**

15        **A.    Medi-Cal and IHSS**

16            1.  <u>Plaintiffs' Statement</u>

17        Medicaid, called Medi-Cal in California, is a joint federal and state medical

18  assistance program for eligible low-income people. [P3, P6]; Answer to Second

19  Amended Complaint ("Answer") ECF No. 71 ¶¶ 26, 28. The purpose of Medicaid is to

20  furnish "medical assistance on behalf of . . . aged, blind, or disabled individuals, whose

21  income and resources are insufficient to meet the costs of necessary medical services"

22  and "to help such families and individuals attain or retain capability for independence or

23  self-care . . . ." Answer ¶ 29; 42 U.S.C. § 1396-1. DHCS is "the single state agency"

24  designated to oversee the Medi-Cal program, and Jennifer Kent is DHCS' current

25  Director. [P5-P7]; Answer ¶¶ 26, 27, 31. Defendants are obligated to comply with

26  federal and state anti-discrimination laws in their administration of Medi-Cal. *Id.*

27        The Medi-Cal program provides an array of medical services, treatments, and

28  therapies for individuals who meet "medical necessity" criteria. Welf. & Inst. Code §§

14059.5, and 14133.3. Medi-Cal includes institutional care such as nursing facility and hospital services. [P38]. Medi-Cal also includes In-Home Supportive Services ("IHSS"), which pays for up to 283 hours per month for unlicensed personal attendant care services so eligible recipients can remain safely in their homes. Welf. & Inst. Code §§ 12300 *et seq*.; 14132.95. IHSS services include: chore services (e.g., housecleaning, meal preparation, laundry, and grocery shopping); personal care services (e.g., bowel and bladder care, bathing, grooming); and paramedical services. Welf. & Inst. Code §§ 12300, 14132.95. Medi-Cal also includes NF/AH Waiver services, subject to the limitations discussed *infra* in Sections II.B.1. and II.C.1., such as, *e.g*., private duty nursing (in-home nursing), unlicensed attendant care (Waiver Personal Care Services, or "WPCS"), Registered Nurse ("RN") case management, non-RN case management, and habilitation. Waiver DHCS1433-1434, 1438, 1530-1532, 1627.

### 2.  Defendants' Statement

The Medicaid program was created by Title IXX of the Social Security Act is a cooperative endeavor in which the federal government provides financial assistance to participating states to aid them in furnishing care to needy persons. *Harris v. McRae*, 448 U.S. 297, 308, 100 S. Ct. 2671, 65 L. Ed. 785 (1980).  The Department, through the California Medicaid program (Medi-Cal), reimburses health care providers for the cost of providing medically necessary services to Medi-Cal recipients. *See, e.g*., Cal. Welf. & Inst. Code §§ 14059, 14059.5, 14133.3 (West 2016). The cornerstone of Medicaid is financial contributions by *both* the federal government and the participating State. (Emphasis added.)  *Harris*, 448 U.S. at 308.

## B.    The NF/AH Waiver Program and Defendants' Cost Limits

### 1.  Plaintiffs' Statement

The Centers for Medicare and Medicaid ("CMS") is the federal agency that oversees the administration of each state's Medicaid program. CMS HCBS Waiver: *Instructions, Technical Guide, and Review Criteria*, January 2015 ("CMS Tech. Guide") PL000669-1007 at PL000973. CMS has the authority to waive certain provisions of

5

federal Medicaid law to allow states to provide home and community-based services ("HCBS") in lieu of institutional care, for individuals who otherwise would require care in a medical facility. [P21]; 42 U.S.C. § 1396n(c)(1); *Steimel v. Wernert*, Nos. 15-2377, 15-2389, 2016 WL 2731505 at *1 (7th Cir. May 10, 2016).

The NF/AH Waiver is one of several HCBS Waivers in California directly operated by DHCS; it provides critically needed nursing and other services to Plaintiffs and others to live safely at home. [P24]; Pls.' Ex. 9 DHCS 1432-1779 ("NF/AH Waiver" or "Waiver") at 1447; [P17]; Supplemental Report of Plaintiffs' Expert Dr. Charlene Harrington, Ph.D. ("Harrington Supp. Rpt.") at 2, 10-11. The Waiver must be approved by CMS and Defendants must adhere to all requirements in the approved Waiver Application. [P20]; *Steimel v. Wernert*, 2016 WL 2731505, at *2; CMS Tech. Guide at PL000680, 705, 730-733; Harrington Supp. Rpt. at 3. The NF/AH Waiver program comprises part of the State's *Olmstead* plan to comply with its ADA obligations. [P27]; Dep. of Rebecca Schupp ("Schupp Dep.")[2] 26:19-21. CMS approval of the Waiver, however, does not mean that DHCS has fulfilled its ADA and *Olmstead* obligations. [P28]; CMS Tech. Guide at PL00688; DOJ SOI at 2, n. 4; DOJ Supp. SOI at 1:13-14.

Federal law requires that Defendants demonstrate "cost neutrality" to the Medi-Cal program in the aggregate for the entire Waiver. [P32-33, P51, P51.1]; CMS Tech. Guide PL000682-683, 955-957, 974; Waiver DHCS1441; Harrington Supp. Rpt. at 6. In other words, "the average per participant expenditures for the waiver and non-waiver Medicaid services must be no more costly than the average per person costs of furnishing institutional (and other Medicaid state plan) services to persons who require the same level of care."[3] *Id.* CMS permits states to set individual cost limits at or even

---

[2] Rebecca Schupp, Chief of the Long-Term Care Division for DHCS has been deposed as DHCS' 30(b)(6) witness on four occasions.  The depositions held on October 9, 2015 and January 20, 2016 are combined and referred to herein as "Schupp Dep."; the May 17, 2016 deposition is referred to as "Schupp Dep. May 17" and the May 27, 2016 deposition is referred to as "Schupp Dep. May 27".

[3] The "level of care" criteria for the NF/AH Waiver explicitly describe the type and level (or severity) of functional limitations and/or skilled nursing needs an individual to be admitted to an institutional setting. Upon meeting level of care criteria, an individual may qualify for corresponding Waiver services. Pls.' Ex. 9, Waiver 1437, 1455-1457.

above the rate for comparable institutional care, or forgo individual cost limits altogether, as long as the state maintains aggregate cost neutrality. *Id.*; Waiver DHCS1457-1459; Schupp Dep. 27:12-19, 28:12-16, 29:7-18, 30:13-18; CMS Tech. Guide PL000749-751; Harrington Supp. Rpt. at 6. Despite this flexibility, however, DHCS has set individual cost limits far below comparable institutional rates. [P53, P55-65]. These cost limits were set ten years ago and have not increased. [P61].

Although CMS also permits Defendants the option of authorizing NF/AH Waiver services to individual participants in excess of their individual cost limitation, Defendants have not selected this option in the current Waiver. [P67]; Waiver at DHCS 1460; Schupp Dep. 66:18-67:8; *see generally* Harrington Supp. Rpt. 7-9. Rather, when a Waiver participant's service needs exceed his/her individual cost limit, DHCS may require that participant to utilize lower cost Waiver services (i.e., unlicensed attendant care instead of nurses) or reduce the amount of services the participant receives. [P99-100]; Schupp Dep. 72:4-74:14; Schupp Dep. May 17 56:23-59:24; Dep. of Christine King-Broomfield  ("King Dep") 72:9-73:17; Pls.' Ex. 65 (LAO Response) at DHCS9884-9885; Pls.' Ex. 66 at 13891-92. Waiver participants with service needs in excess of the individual cost limits may also be disenrolled from the Waiver and "will have no other option but be admitted to nursing facilities to ensure their health and safety." [P90.1, P97, P97.1, P98.2, P101; *see also* WA-P4]; Pls.' Ex. 56 at 7935, 13480; Waiver DHCS1458, 1460, 1721; Schupp Dep. 76:11-77:1; *see also* [P90.1]; Pls.' Ex. 77; Dep. of Sarah Brooks ("Brooks Dep.") 13:15-15:15, 17:18-19:7. Waiver applicants whose service costs would exceed the individual cost limit for their assigned level of care are denied admittance to the Waiver. [P69]; Waiver DHCS1458; CMS Tech. Guide PL000749.  Consequently, these people may be forced to remain unnecessarily institutionalized. *See* Declaration of Debbie Toth ("Toth Dec.") ¶¶ 23-24.

The individual cost limits under the NF/AH Waiver were set in 2007 based on 2006 institutional rates and have not increased. [P61]; Schupp Dep. 33:1-4, 29:17-18; Pls. Ex. 65 (LAO Response) at DHCS 9882-9883. Meanwhile, rates for comparable

institutional care have increased annually since 2007 and are significantly higher than Waiver individual cost limits at each level of care:

| Institutional Level of Care | Annual Institutional Rate | DHCS Annual NF/AH Waiver Cost Limits |
| --- | --- | --- |
| Nursing Facility (NF)-A | $34,388 | $29,548 |
| Nursing Facility (NF)-B | $75,000 | $48,180 |
| NF-B Pediatric | $110,280 | $101,882 |
| NF-Distinct Part | $124,342 | $77,600 |
| NF-Subacute, Adult | $271,697 | $180,219 |
| NF-Subacute, Pediatric | $282,574 | $240,211 |
| Acute Hospital | $437,757 | $305,283 |

[P55-62]; Pls.' Ex. 9, NF/AH Waiver, DHCS1458; DHCS 3536-3537 (2007-2011 NF/AH Waiver Subacute level of care cost limit); Schupp Dep. 83:1-14, 31:24-32:9, 33:10-19, 33:5-9, 79:1-5, 34:13-15, 35:12-21. As a result of the cost limits, in 2014 and 2015, Defendants spent one-third less on Waiver participants in the aggregate than they would spend if those individuals were placed in comparable Medi-Cal funded institutions. [P53, P70, P71]; Dep. of Adam Dorsey ("Dorsey Dep.") 114:10-19; Schupp Dep. 176:23-177:2; Pls.' Ex. 62, DHCS11782 (Waiver Cost Neutrality Rept.); Pls.' Ex. 67, DHCS11206 (DHCS email re budget neutrality); Harrington Supp. Rpt. at 1, 7-10.

On April 15, 2016, Defendants submitted a proposed Amendment to the NF/AH Waiver to CMS. [WA-P1]. The Waiver Amendment is intended only to implement new provider compensation provisions in the federal Fair Labor Standards Act; it is not intended to address the requirements of the ADA, Section 504, or Government Code section 11135. [WA-P2—WA-P8]; Schupp Dep. May 17 51:4-13; 54:19-55:25; Defs.' Resp. Pls.' 2nd Req. for Adm., Resp. to No. 19. The proposed Waiver Amendment estimates an increase in Waiver costs only due to increases in minimum wage and payment of overtime to providers and not to any increase in provision of additional services over the current cost limits for Waiver participants, such as Plaintiffs. [WA-P27—WA-P32; WA-P82—WA-P83]; Schupp Dep. May 17 142:2-13; Alspektor Dep. 48:1-51:22. The proposed Amendment still includes the current Waiver's cost limits for authorization of Waiver services, but allows for a discretionary "second level review" in certain circumstances. [WA-P20, WA-P43, WA-P45—WA-P47, WA-P51, WA-P64—

8

1  WA-P67]; June 27, 2016 Waiver Amendment application ("6/27 Waiver Amendment

2  App.") DHCS18302-DHCS18524 at DHCS18328. But DHCS has not developed

3  policies, procedures, or other guidance for implementation of either the second level of

4  review, or any other aspect of implementation of the proposed Waiver Amendment.

5  [WA-P35—WA-P40, WA-P44—WA-P62, WA-P67]; Schupp Dep. May 27 31:6-33:7,

6  60:4-61:21; Schupp Dep. May 17 69:12-70:3, 99:20-101:20, 104:2-12, 118:14-23,

7  121:4-9; King-Broomfield Dep. June 2 14:5-12, 21:20-25, 22:18-24, 23:6-11, 26:16-23;

8  33:17-34:21, 36:1-38:7; Defs.' Resp. to Pltfs.' 2nd Req. for Adm. Nos. 20, 21, 24, 30,

9  31. Nor has DHCS formulated plans to provide notice to Waiver participants and others,

10  including Administrative Law Judges, about the proposed Waiver Amendment. [WA-

11  P68—WA-P70, WA-P72—WA-P76]; Schupp Dep. May 17 116:6-118:13; Schupp Dep.

12  May 27 54:1-57:1; Defs.' Resp. to Palomares 2nd Set of Interrogatories, No. 14 (re RFA

13  No. 21). Since April 15, DHCS has submitted three revised versions of the Waiver

14  Amendment to CMS, including on June 27, 2016. [WA-P12, WA-P12.1, WA-P12.3];

15  6/27 Waiver Amendment App. DHCS18302-DHCS18524. On July 14, CMS gave

16  DHCS a formal Request for Additional Information, thereby initiating a new 90-day

17  review period for the Amendment.  [WA-P94.1]. If approved, the Amendment would

18  expire on December 31, 2016. [WA-P11]; Schupp Dep. May 17 33:20-23.

19       On June 10, 2016, DHCS released a 15-page summary of its proposal to renew the

20  Waiver, effective January 1, 2017.  [D132, D139].  DHCS has not produced or shared

21  any other documents that describe the intended implementation of the renewed Waiver.

22  The Renewal proposal states that DHCS will continue to use "an individual cost limit"

23  but one which purportedly "calculates cost neutrality in the aggregate across all Waiver

24  participants." Waiver Renewal Proposal DHCS 16776-16790 at DHCS16786.

25       2.  Defendants' Statement

26       The Court should disregard Plaintiffs attempt to mislead the Court regarding the

27  terms and intent of the Department's proposed Waiver amendment and the waiver

28  renewal proposal.  At the very least, Plaintiffs' assertions regarding the proposed Waiver

amendment and the proposed Waiver renewal create issues of disputed material fact that prevent any summary judgment in this case.  Under past federal Medicaid rules, a state could not receive federal financial participation for providing in-home or community-based medical services. *See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 83 (1999). However, the Centers for Medicare and Medicaid Services ("CMS"), a bureau within the federal Department of Health and Human Services that oversees the administration of the Medicaid program offered by each state, has the authority to waive certain provisions of federal Medicaid law to allow states to provide home and community-based services to individuals who otherwise would require institutional care. *See* 42 U.S.C. § 1396n(c)(1). CMS requires that such a "Waiver" program does not exceed the cost of institutional care. 42 U.S.C. § 1396n(c)(2)(D). This is commonly referred to as "federal cost neutrality."

On March 19, 2012, CMS approved the Department's application to amend the current NF/AH Waiver,[4] which provides certain Medi-Cal beneficiaries the option of returning to and remaining in their homes or home-like community settings in lieu of residing in medical care facilities. [D4]. NF/AH Waiver participants have significant flexibility in selecting the medically necessary Waiver services they receive. [D10]. Participants may select a combination of medically necessary NF/AH Waiver services, including Private Duty Nursing, Waiver Personal Care Services, Case Management, and Habilitation services. [D11]. Participants may also receive other medically necessary State Plan benefits such as In-Home Supportive Services ("IHSS") that are themselves non-medical but which allow the participant to remain safely outside of a medical facility.  These include services such as housecleaning, meal preparation, laundry, grocery shopping, personal care, bowel and bladder care, bathing, and paramedical services. [D12]; Waiver DHCS1490. The Department utilizes a Menu of Health Services

---

[4] The current NF/AH Waiver expires on December 31, 2016. *See* Rebecca Schupp, February 26, 2016 Declaration, ¶4, Ex. 1, Waiver DHCS1432. The Department is in the process of renewing the Waiver. [D28.] As part of that process, the Department solicits stakeholder input, including from Plaintiffs and their counsel. [D30.]

1   to assist participants in choosing a combination of medically necessary Waiver services

2   to support their needs in the home and community. [D13]; [D4], Ex. 1, DHCS1459.

3          Under the terms of the NF/AH Waiver, each participant has a yearly individual

4   "cost limit," which is the annual amount of funding that the participant may use to pay

5   for specified services. [D14]; Waiver DHCS1457–59. The individual cost limits were

6   approved by CMS as part of its approval of the NF/AH Waiver. [D14(b).] The individual

7   cost limit for each participant corresponds to the participant's assessed "level of care."

8   [D15]; Waiver DHCS1458. The levels of care under the NF/AH Waiver include, but are

9   not limited to, Nursing Facility Level A, Nursing Facility Level B ("NF-B"), Subacute

10  Facility ("Subacute"), and Acute Hospital.  Waiver. [D16]; [D4], Ex. 1, DHCS1456. Mr.

11  Thomas and Mr. Benison have been assessed at the Subacute level of care. SAC, ¶ 45,

12  ECF No. 56-1. Mr. Palomares has been assessed at the NF-B level of care. SAC ¶ 46,

13  ECF No. 56-1. Contrary to Plaintiffs' allegations, the Department is unaware of any

14  participant who was disenrolled from the Waiver program because the cost of their

15  NF/AH Waiver services exceeded the individual cost limit and they had no other option

16  but to be admitted to nursing facilities." [D26.] Instead, the Department has authorized,

17  and continues to authorize, medically necessary Waiver services costing in excess of the

18  individual cost limit for over 400 Waiver participants to ensure that they can remain

19  safely in their homes. [D19.]

20         The Department has submitted to CMS a proposed Waiver amendment to

21  eliminate the costs limits, which must be approved by CMS. [D98.] The proposed

22  Waiver amendment, contrary to Plaintiffs' claim, will not limit medically necessary

23  services based upon "cost limits." Instead, the proposed Waiver amendment authorizes

24  medically necessary Waiver services regardless of the cost limits. [D100.] Under the

25  "No Cost Limit Option," there will be no limitation to the cost of a Waiver participant's

26  Waiver services so long as a second level of review has been completed to confirm that

27  the requested services are medically necessary. [D101.] Plaintiffs' factual assertions

28  about the implementation of the Waiver amendment, including the second level of

review, are also disputed. The specifics for the second level of review are subject to change as a result of CMS's review of the proposed Waiver amendment. Nonetheless, the Department will take the necessary steps to implement the CMS approved Waiver amendment, including the second level of review, once it is approved by CMS. [D131.]

Further, a dispute also exists with regard to the Waiver renewal proposal. Contrary to Plaintiffs' claim, the proposed Waiver renewal also eliminates the individual cost limits. Nonetheless, the Waiver renewal proposal must also be approved by CMS. The Waiver renewal proposes to "shift away from an individual per Participant cost limit to a model that calculates cost neutrality in the aggregate." [D145.] Plaintiffs' criticisms of the future administration of the proposed Waiver amendment and renewal proposal are premature and unjustified. First, they must both be approved by CMS and are subject to change. Second, Courts should provide states with leeway to administer benefit programs. Despite the integration mandate, courts normally will not tinker with comprehensive, effective state programs for providing care to the disabled. *The Arc of Washington State Inc., v. Braddock,* 427 F.3d 615, 618-619 (9th Cir. 2005) (citing *Sanchez v. Johnson*, 416 F.3d 1051, 1067-68 (9th Cir. 2005)). When there is evidence that a state has in place a comprehensive deinstitutionalization scheme, which, in light of existing budgetary constraints and competing demands of other services that the State provides, is "effectively working," courts should not tinker with that scheme. *Sanchez v. Johnson* (9th Cir. 2005), 416 F.3d 1051, 1067-68. Here, the Waiver is "effectively working," given the large Waiver population and the competing budgetary restraints. As of March 31, 2016, it provided services for 3,084 Medi-Cal beneficiaries on the Waiver, with 439 at the intake status. [D4(a).] Accordingly, this Court should not engage itself in the details of the Waiver, given the intended leeway to be provided to the public benefit programs, nor allow it to be the basis to grant this Motion.

## C.    Implementation of Defendants' Individual Cost Limit

### 1.    Plaintiffs' Statement

Upon referral to the Waiver program, DHCS Nurse Evaluators assess Waiver

12

applicants and participants to: determine their "level of care"; review and authorize Waiver services consistent with a physician-signed Plan of Treatment; and ensure that the participants' Medi-Cal funded services do not exceed the annual individual cost limit. [P79-87]; Waiver at DHCS 1459; King Dep. 69:12-15. DHCS Nurse Evaluators develop a Menu of Health Services ("MOHS"), which includes Waiver service options (including IHSS services) that the participant may select *up to the individual cost limit*. [P88-96]; King Dep. 107:25-108:17; Dep. of Katrina Baker ("Baker Dep.") 47:3-14; 53:14-23; Dep. of Leah Greenwood ("Greenwood Dep.") 50:2-51:4; 78:19-79:1; Toth Dec. ¶ 21. DHCS only authorizes medically necessary services which are set forth in the Plan of Treatment and which the Waiver participant requires to live safely at home. [P75, 86]; Waiver DHCS1452-1453, 1682-1683, 1691, 1754; Baker Dep. 139:16-18.

When DHCS Nurse Evaluators receive requests for services above the individual's cost limits, they must discuss the case with their supervisors. [P85, P96, P108]; King Dep. 105:5-8, 89:16-25. It is undisputed that DHCS has no written policies or criteria for approving ongoing services, such as nursing, attendant care, or case management, over the individual cost limits.[5] [P93-95, P110]; Schupp Dep. 75:8-11, 201:19-203:12, 204:25-205:13, 208:13-209:10; King Dep. 104:4-6, 105:18-25. DHCS staff are not trained to consider, and Waiver participants and service providers are not informed of the availability of, services over their individual cost limits. [P92, P96, P160]; King Dep. 105:5-15; Defs.' Resp. Pls.' Req. for Adm. No. 14; Toth Dec. ¶¶ 22-23.

Despite the Waiver's prohibition on payment of services over the cost limits, ([P67-P69, P90]), DHCS does approve such services for some people in limited

---

[5] On June 24, 2016 DHCS produced a document purporting to be a "MOHS" exception policy. DHCS 18298-18299.  Until this time, DHCS admitted that it had no written policy or criteria for authorizing services over the Waiver cost limits.  *See e.g.,* ECF No. 113 (Statement of Uncontroverted Facts, Defs.' Resp. to P93 and P95). Plaintiffs object to the untimely production of this document, which is dated 2011 and should have been produced before discovery closed. In any case, this "policy" is largely irrelevant to the present case, as it is for "rare instances" of certain Waiver applicants in the California Community Transitions ("CCT") program (in which Plaintiffs do not participate) leaving long-term institutional care, and does not provide for ongoing services such as nursing or attendant care. [P93.1, P93.2]. Those responsible for using the policy were not aware of it. Toth Dec. ¶ 25.

13

circumstances when:  (1) individuals take legal action to challenge the cost limits ([P114, P179, P229, P298, P321, P323]); (2) the provision of services over the cost limit is discovered after-the-fact ([D19]; Schupp Dep. 205:17-208:8); and (3) costs increase due to wage adjustments or payment of overtime  ([P45, P109, P113, P114]).  These practices are not consistently communicated to staff, nor applied across-the-board. [P110, P112]; King Dep. 88:12-89:25; Baker Dep. 91:8-22, 92:13-25.

## 2.    Defendants' Statement

Plaintiffs' statements about the individual cost limit demonstrate, yet again, that there are multiple disputes as to the material facts of this case precluding summary judgment. Contrary to Plaintiffs' contention, the Department has taken steps to ensure that Waiver participants are able to maintain their medically necessary waiver services even when the cost of those services increases.  The Department communicated to staff that cost increases due to wage adjustment or payment of overtime are not be counted against a beneficiary's cost limit. Specifically, Department staff have been instructed not to count a legally mandated increase in the hourly wage of Waiver Personal Care Services and IHSS against the individual cost limit for a beneficiary's level of care so long as the amount of services remained the same. [D24.] This is permissible under the terms of the NF/AH waiver because there is no change in the scope, duration, or amount of the Waiver services. [D4 (Waiver, DHCS1457–1459).] In addition, California Welfare and Institutions Code section 12300.4, which implements the overtime standards of the Federal Fair Labor Standards Act, includes language to address the impact of the overtime rules on NF/AH Waiver participants.

Department staff re-assesses Waiver participants' medical needs, which includes the level of care, on a regular basis, and as necessary if there is an indication of a change in condition that may warrant a change in the level of care or services required to ensure that participants can remain safely at home or in a community setting. [D20.] The Department authorizes services under the NF/AH Waiver for the number of days specified by the treating physician, up to a

14

maximum of 180 days. California Code of Regulations, tit. 22, § 51003 (West 2016). Medical service authorizations, i.e. authorized hours of care, are effective in thirty day increments, which are generally referred to by the treating physicians and the Department as a "month." [D36, D38.]  In certain individual cases, based on the information provided by physicians and the individual medical needs of the NF/AH Waiver participant, the Department staff have authorized the participant to receive Waiver services costing in excess of the NF/AH Waiver's individual cost limit so that the participant may remain safely in their home or community setting. [D22.]

In the course of routine and as necessary change of condition reassessments, Department staff independently consider the medical needs of each participant with the goal of enabling them to remain safely in their home or chosen community environment, as each participant has different medical and physical conditions, circumstances, and living arrangements. [D21.] The Department staff authorize beneficiaries to receive the medically necessary waiver services according to the terms of the NF/AH Waiver and the above listed instructions and statutes. Accordingly, Plaintiffs' claim that the Department's staff are not trained to approve services above the individual cost limits is clearly disputed.

### D.   Individual Plaintiffs

#### 1.   Plaintiffs' Statement - Jerry Thomas

Plaintiff Jerry Thomas is 75-years-old and has Progressive Supranuclear Palsy, a degenerative brain disorder that causes serious and progressive problems with gait and balance, eye movement, cognitive difficulties and muscle weakness. [P118, 119]. He also has Post-Polio Syndrome, quadriplegia, chronic pain syndrome, chronic respiratory failure, and other chronic and serious conditions. [P116, 117, 138]. Mr. Thomas lives at home with his wife of over 30 years. Declaration of Beverly Thomas ("Thomas Dec.") ¶¶ 2, 7. Before being admitted to the Waiver, Mr. Thomas spent 13 years in various skilled nursing facilities, where he experienced life-threatening incidents of abuse and

neglect. *Id.* at 4-6; Thomas Dep. 32:8-42:3, 45:24-57:1.

According to DHCS medical expert Dr. Rajiv Dhamija, Mr. Thomas requires 24-hour-per-day skilled care to remain living at home and to prevent serious medical conditions, even death. [P187]; Defs.' Expert Rebuttal Report, Pls.' Ex. 70 ("Dhamija Reb. Report") at 19; Defs.' Ex. 69 at 15; Dhamija Dep. Vol. II, 152:11-21. He cannot move his extremities and cannot speak. [P120, 127]; Dhamija Dep. Vol. I, 27:9-14. Mr. Thomas has a tracheal tube because he cannot swallow on his own; his tube is connected to a ventilator and oxygen to help him breathe. [P121, 122, 124]; Pls.' Ex. 48. Because of his mucous secretions and loss of muscle function, Mr. Thomas must be suctioned as needed, when saliva builds up in the mouth, nose and throat, and to avoid pooling of mucus or any fluid in the lungs. [P124] Pls.' Ex. 48 (Plan of Treatment ["POT"] 10/18/15). Mr. Thomas is constantly at risk of a mucous plug forming, which may obstruct breathing and potentially cause death. [P133, 134]; Dhamija Dep. Vol. I, 51:23-24, 52:22-24. Mr. Thomas also receives nutrition and medication through his gastrostomy tube ([P123]; Pls.' Ex. 48), and takes 39 medications, including narcotics and seven medications that are administered as needed. [P125]; Pls.' Ex. 48.

On January 15, 2013, while he was residing at a Subacute nursing facility, DHCS determined that Mr. Thomas met the Subacute level of care for the Waiver and authorized 450 hours per month of in-home licensed vocational nursing ("LVN") care, based on the cost limit of $180,219. [P148, 150, 151]; Thomas Records 000726-734. On February 19, 2013, Mr. Thomas was approved by Orange County for approximately 240 hours of IHSS services. [P152]; 000736. The combination of Waiver-funded nursing care and IHSS fulfilled 690 hours per month of his constant care needs. [P153, 155]; Pls.' Ex. 43 at 000360-376. His wife provided the rest of his care, filling in to cover missed shifts and providing backup to the IHSS workers. Thomas Dec. ¶¶ 9, 11.

On October 16, 2013, DHCS conducted a home visit and determined that Mr. Thomas' services exceeded the maximum budget allowed by the Waiver. [P155]; Pls.' Ex. 43. Despite his wife's request for 24 hours per day of nursing services due to the

complexity and unpredictability of Mr. Thomas' health condition, DHCS sent Mr. Thomas a Notice of Action reducing his nursing hours from 450 hours to 430 hours per month. [P158, 161]; Pls.' Ex. 44 (NOA); Pls.' Ex. 43 (IHO Case Report) at 374. The sole reason for this reduction was that the combination of Waiver services and IHSS exceeded the cost limit for his level of care. [P157, 162]; Pls.' Ex. 44; Greenwood Dep. 97:11-15. Mr. Thomas timely appealed the action and was allowed to continue receiving 450 hours of LVN care per month pending the outcome of his hearing. [P164].

After a hearing on September 23, 2014, the administrative law judge ordered a reassessment of Mr. Thomas' level of care. [P169, 170]; JT-002309-JT-002323. In July 2015, Mr. Thomas' IHSS increased to 283 hours per month. [P171]; Pls.' Ex. 50 (10/22/15 MOHS). DHCS contracted with Dr. Dhamija to perform a reassessment of Mr. Thomas. [P182]; Pls' Ex. 52. On December 3, 2015, DHCS sent Mr. Thomas Dr. Dhamija's report, along with a notice of action stating that Dr. Dhamija determined that Mr. Thomas remains at the Subacute level of care.  [P182, 185]; *Id.*

### 2.   Defendants' Statement – Jerry Thomas

Plaintiffs' allegations regarding Jerry Thomas clearly establish that there is a dispute regarding a material fact precluding summary judgment. Although Plaintiffs' counsel implies that Mr. Thomas is in danger due to actions or inactions by the Department, the truth is that he has consistently received the services he needs and has been safely at home the entire time that he has been enrolled in the Waiver. He has not been at risk of institutionalization during the time he has been enrolled in the NF/AH Waiver. Mr. Thomas resided at several different skilled nursing facilities prior to moving home on April 1, 2013. As Mrs. Thomas summarized, there had been "issues" at every facility where Mr. Thomas was a resident. [D40.] Because of the various issues experienced by Mr. Thomas at the nursing facilities, Mrs. Thomas would never consider taking Mr. Thomas back to a skilled nursing facility. [D41.] "Not in this lifetime," Mrs. Thomas testified. [D42.]

Since returning home and receiving services under the NF/AH Waiver, Mr.

1   Thomas has been well cared for. [D43.] This fact is proven by the testimony of

2   Thomas's own treating physician, Raouf Kayaleh, M.D. According to Dr. Kayaleh, Mr.

3   Thomas has had fewer infections while living at home than living at a facility. [D44.] He

4   believes Mr. Thomas has been receiving proper care at home. [D45.] Dr. Kayaleh does

5   not believe Mr. Thomas has experienced any deficient or improper care at home, for

6   example, at any point in 2015. [D46.] Dr. Kayaleh testified that Mr. Thomas

7   "absolutely" has been doing better medically since returning home. [D47] Since

8   returning home, Mr. Thomas has been medically stable. [D54.] Dr. Kayaleh's

9   assessment is confirmed by Mr. Thomas's neurologist, Amir Shokrae, M.D., who

10  testified that Mr. Thomas has been staying at home with good care. [D48.] According to

11  Dr. Kayaleh, Mr. Thomas receives more 1:1 attention at home than he did previously at

12  the subacute facility, where staffing limitations restrict the amount of 1:1 time that a

13  nurse can spend with a single patient. [D49.]

14      Although Dr. Kayaleh signed Mr. Thomas's Plans of Treatment, he hardly reviews

15  information noted in the Plans that are submitted to the Department for approval of Mr.

16  Thomas's Waiver services. He spends "less than minutes" reviewing and signing Mr.

17  Thomas's Plans of Treatment. [D50.] Dr. Kayaleh did not direct the number of care

18  hours that Mr. Thomas receives under the Waiver. [D51.] Similarly, Dr. Kayaleh also

19  did not order the number of care hours for Mr. Thomas that are noted in the Plans of

20  Care. [D52.]

21      There has been no change to Mr. Thomas's Waiver benefits through the Waiver

22  program since he entered the program on April 1, 2013. [P172.] The January 9, 2014

23  Notice of Action, which would have reduced Mr. Thomas's Licensed Vocational Nurse

24  ("LVN") authorization from 450 to 430 hours per month, effective January 24, 2014,

25  never went into effect. SAC ¶ 75, ECF No. 70. On February 10, 2014, Mr. Thomas

26  appealed a proposed reduction in services with the Department as part of the

27  administrative process, and was granted Aid Paid Pending. [P164; D55.] Aid Paid

28  Pending allows a beneficiary to continue to receive a prior level of care while an appeal

18

is pending. *See* Department of Social Services Manual of Policies and Procedures § 22-072.5. [D53] As part of the administrative appeal, an administrative law judge ("ALJ") ordered that Mr. Thomas be reassessed by a physician to determine his proper level of care. [D56.]

Dr. Rajiv Dhamija conducted an in-person assessment and evaluation of Mr. Thomas on November 2, 2015. [D57.] Dr. Dhamija is a senior physician at Rancho Los Amigos National Rehabilitation Center in Downey. [D58.] He has been Chief of the Utilization Management and Medical and Surgical System of Care at Rancho Los Amigos National Rehabilitation Center. [D59.][6] As a result of Dr. Dhamija's in-person assessment and review of Mr. Thomas's records, Dr. Dhamija concluded that Mr. Thomas "appeared to be well cared for in the home setting." [D60.] He concluded that Mr. Thomas "is currently doing well at home with . . . satisfactory skilled nursing care being provided." [D61.] Mr. Thomas's ongoing medical requirements including skilled assessments, skilled nursing care, and medical services remain unchanged. [D62.]

The Department has authorized Mr. Thomas to receive all medically necessary NF/AH Waiver services, including 450 hours of LVN private duty nursing a month, even if the cost of those services exceeds the NF/AH Waiver individual cost limits. [D64.] Specifically, every thirty days, Mr. Thomas is authorized to receive (1) 450 hours of LVN private duty nursing; (2) one two-hour visit a month by an R.N. to provide case management services; and (3) 283 hours of IHSS services. [P. 173; D64.] These care hours *exceed* what Mr. Thomas requested in the SAC by 42.96 hours and what he requested in the Plan of Treatment.[7] [P177.] Accordingly, Mr. Thomas is authorized to

---

[6] Rancho Los Amigos National Rehabilitation Center is recognized as an international leader in rehabilitation medicine and clinical research, and since 1989, the hospital has been consistently ranked as one of "America's Best Hospitals" in rehabilitation by *U.S. News and World Report*. As one of the largest rehabilitation hospitals in the United States, Rancho Los Amigos cares for approximately 4,000 patients each year and services 71,000 outpatients each year.

[7] In the SAC, Mr. Thomas requested a temporary restraining order and preliminary injunction preventing the Department from decreasing his services below "450 hours per month of licensed vocational nursing care, two hours per month of RN care and 240.04 hours per month of IHSS personal care services . . . ." SAC Req. for Relief ¶ C, ECF No. 70.

receive 24.43 daily hours of care. [D64.] The Department will continue to authorize all medically necessary NF/AH Waiver services for Mr. Thomas, even if the services would exceed the individual cost limit for his level of care. [D65.] The Department made this clear in its December 2, 2015 letter, by stating: "If the cost of Mr. Thomas' medically necessary Waiver services exceed the Waiver's current individual cost limit, the State will continue to pay for those medically necessary Waiver services." [D65.] Thus, there is a material dispute as to the facts pertaining to Plaintiff Thomas.

### 3.   Plaintiffs' Statement - Sean Benison

Plaintiff Sean Benison is 44 years old and has advanced hereditary progressive Becker Muscular Dystrophy. [P190], Pls.' Ex. 40. Mr. Benison also has chronic respiratory failure, and is quadriplegic and dependent on a tracheostomy and ventilator. [P191]. Mr. Benison uses a wheelchair for mobility at all times. *Id*. He cannot move, turn, feed, dress, bathe or take care of himself. *Id*. Before his condition deteriorated, Mr. Benison was working on his Ph.D. in Geography at the University of California Santa Barbara and living on his own. Benison Dec. ¶¶ 7, 8. After living for two years in a Subacute facility, he was able to move to his own apartment in 2013, where he resides with a live-in paid attendant for his backup care. Benison Dec. ¶¶ 2, 9, 13.

Like Mr. Thomas, Mr. Benison requires 24-hour care per day. According to Defendants' medical expert, around-the-clock observation is essential for Mr. Benison to maintain his current living at home situation and to prevent death. [P197]; Dhamija Dep. Vol. II, at 44:21-47:1; Pls.' Ex. 70 (Dhamija Rpt.) at 8. He too needs suctioning and respiratory treatments frequently to maintain an open airway. [P203]; Dhamija Dep. Vol. II, 129:21-130:1. If appropriate action is not taken in response to a change in lung status, Mr. Benison could aspirate the secretions into his lungs, which may lead to death from lack of oxygen. [P202]; Dhamija Dep. Vol. II, 129:6-20.

DHCS admitted Mr. Benison into the NF/AH Waiver in September 2013. [P208]; Pls.' Ex. 37 at 1. DHCS determined that he met the Subacute level of care and authorized 480 hours per month of in-home nursing care, based on the cost limit of $180,219 for his

level of care. [P209]; Solano Dep. 42:10-12; Pls. Ex. 37 at 1. In 2014, Ventura County authorized 260 hours of attendant care through IHSS, of which 217 was direct or "hands-on" care.[8] [P210]; Defs.' Ex. 22 at SB000457; Pls.' Ex. 39 at SB000440-442. In July 2014, DHCS reduced his Waiver nursing hours to 416 per month because the cost of his Waiver and IHSS services exceeded his cost limit. [P214]; Solano Dep., 50:17-22; Pls.' Ex. 41. In July 2015, his IHSS increased to 283 hours per month (236 hours of direct care), for a total of 656 hours of direct care per month. [P218]; SB000325-000326; SB000478. Although the increase in IHSS hours made his Waiver and IHSS services exceed the cost limit for his level of care, DHCS made the "per management" decision not to reduce his nursing services again. [P216]; Pls.' Ex. 40 at 18. However, this left Mr. Benison with a 67 hours per month gap in coverage to meet his 24-hour needs. [P216]; Defs.' Ex. 27 at 1; [P218]; SB000325-000326; SB000478. Mr. Benison has been forced to pay out of pocket and rely on the charity of family to cover the cost of additional services that DHCS refuses to authorize. Benison Dec. ¶ 26.

### 4.   Defendants' Statement – Sean Benison

Plaintiffs' contention regarding Sean Benison also establish that there are disputes as to the material facts in this case that preclude summary judgment. Contrary to Plaintiffs' assertion, Mr. Benison receives the care he needs and has not been at risk of institutionalization during the time he has been enrolled in the NF/AH Waiver. Since moving home from a skilled nursing facility and receiving NF/AH Waiver services, Mr. Benison has been very stable and has remained safely at home. [D66, 67.] According to the owner of his home health agency, Debra Hatch, Mr. Benison has been stable in his medical and physical conditions for the past five years. [D68.] As Ms. Hatch testified, "[Mr. Benison] is actually doing very well," and "has not deteriorated at all." [D69.] Mr. Benison is very aware of his condition and is able to direct his own medical care. [D70.] Mr. Benison can and does make sure that he has someone at his home who can care for

---

[8] Direct care is defined in the Waiver as "hands on care to support the care needs of the waiver participant" and can be provided by a licensed nurse or an unlicensed IHSS or WPCS worker. [P49]; Waiver DHCS 1516. *See also*, *e.g.*, Pls.' Ex. 39 at 3.

him. [D71.] He is very aware of the care that he needs on a daily basis. [D72.] In the last two years, Mr. Benison has not complained to Ms. Hatch about the care that he receives under the Waiver program. [D73.] This fact is consistent with Ms. Hatch's testimony that the number of service hours that Mr. Benison is currently receiving under the Waiver adequately covers his needs. [D74.] Further, Dr. Dhamija reviewed Mr. Benison's records and concluded that Mr. Benison is "currently being well cared for" and is safe at home with his current support system. [D75.]

Effective October 1, 2015, the Department authorized Mr. Benison to receive all medically necessary Waiver services, even if the cost of the services would exceed the NF/AH Waiver individual cost limits. [D76.] Specifically, every thirty days, Mr. Benison is authorized to receive (1) 416 hours of LVN private duty nursing; (2) one two-hour visit by an R.N. to provide case management services; and (3) 283 hours of IHSS. [P221; D77.] On February 26, 2016, the Department authorized an additional 0.70 hour per day to ensure that Benison can receive up to 24 hours of care each day of the approval period. [D78.] Although Plaintiffs claim that there is a gap of 67 hours of care for Mr. Benison, this claim is unsupported and disputed.

The Waiver requires that services provided under the Waiver are medically necessary and that a Plan of Care must be reviewed and signed by the participant's primary care physician. [D79.] Although Mr. Benison recently requested habilitation services and additional case management services, the Department cannot process the request because Mr. Benison failed to provide documentation from a physician showing the medical necessity of the additional services. [P225; D79.] The Department has informed Mr. Benison that it will review the request for habilitation services if Mr. Benison provides documentation from his physician requesting the services. [D80.]  As the Department stated in its December 2, 2015 letter, it will continue to authorize all medically necessary NF/AH Waiver services identified in Mr. Benison's Plan of Care, even if the cost of those services exceed the cost limit, by stating: "If the cost of Mr. Benison's medically necessary Waiver services exceed the Waiver's current individual

cost limit, the State will continue to pay for those medically necessary Waiver services." [D80.]

5. <u>Plaintiffs' Statement - Juan Palomares</u>

A former medical laboratory technician, Plaintiff Juan Palomares is 39-years old and became quadriplegic in a motor vehicle accident in 2005. Dec. of Juan Palomares ("Palomares Dec.") at ¶ 2; [P236]; Pls.' Ex. 32 (IHO Case Review) at DHCS 2531. Mr. Palomares has autonomic dysreflexia, a condition that causes instability in blood pressure and heart rate and can be fatal if not treated. [P236-P238]; Dhamija Dep. Vol. II, 153:9-154:7. He also has polycythemia or too many red blood cells. [P240]; Dep. of Brian Leberthon ("Leberthon Dep.") 11:2-4. After his accident, Mr. Palomares lived in a nursing facility for approximately one year. [P257]; Palomares Dec. ¶¶ 5-7; Palomares Dep. 86:8-10. He then moved to an apartment with his father, who left his job as a construction worker to care for his son. Palomares Dec. ¶ 7.

Mr. Palomares requires 24-hour care per day to remain living safely at home and avoid serious medical emergencies. [P244, 248, 255]; Pls.' Ex. 70 (Dhamija Reb. Rpt.) at 7-8; Dhamija Dep. Vol. II, 59:3-6, 155:22-156:20. He is dependent on others for assistance with all of his personal care needs. [P245]; Pls.' Ex. 70 (Dhamija Reb. Rpt.) at 12. He is incontinent and needs assistance with medication administration, nutrition, and feeding. [P246]; Pls.' Ex. 70 (Dhamija Reb. Report) at 12. Mr. Palomares also must be turned every two hours day and night to help prevent skin breakdown. [P247]; Dhamija Dep. Vol. II 153:9-15. According to DHCS's medical expert, "around the clock observation is essential" for Mr. Palomares "to maintain [his] current living at home situation and also to prevent future morbidity and mortality." [P251]; Pls.' Ex. 70 (Dhamija Reb. Rpt.) at 8; Dhamija Dep. Vol. II, 44:21-47:1.

Mr. Palomares was assessed for eligibility for the NF/AH Waiver on December 6, 2006. [P258]; Pls.' Ex. 27. DHCS found that he met the Nursing Facility-B level of care, and authorized 233 hours of WPCS per month in addition to IHSS authorized by Los Angeles County, based on the cost limit of $48,180.00 for his level of care. *Id*. Beginning in 2009, Mr. Palomares was subjected to a series of cuts in his services as a

1  result of exceeding his cost limit. *See* [P263-283], Pls.' Ex. 27 (IHO Summary

2  providing: December 8, 2009 WPCS services reduced; August 1, 2010, WPCS hours

3  reduced; November 1, 2013, WPCS services reduced); Baker Dep. 78:11-99:4.

4      On June 12, 2015, Mr. Palomares' IHSS hours were increased, raising his costs

5  for IHSS and WPCS in excess of his Waiver cost limit. [P286, P291].  His Waiver

6  services were not reduced this time, pursuant to a DHCS supervisor's approval. [P290];

7  Pls.' Ex. 31-32; Baker Dep. 113:2-115:10. Mr. Palomares' services totaled 439 hours of

8  services per month. [P289]. Throughout this time, Mr. Palomares' combined total of

9  WPCS and IHSS hours fell far short of the 24 hour care he needed, and his father

10  provided the remainder of his care without compensation. Palomares Dec. ¶ 9.

11         6.  <u>Defendants' Statement – Juan Palomares</u>

12      Mr. Palomares has participated in the NF/AH Waiver program continuously since

13  2007. [D81] He has not been at risk of institutionalization during the time he has been

14  enrolled in the NF/AH Waiver. Instead, since returning home, Mr. Palomares has

15  remained safely at home. [D82.] Based on a review of the records, Dr. Dhamija

16  concluded that Mr. Palomares has been "well cared for" in his home. [D83.] There have

17  been no recent acute medical events requiring hospitalization or other observed medical

18  negligence requiring hospitalization or higher level of care services. [D84.]

19      As in the cases of Mr. Thomas and Mr. Benison, effective October 1, 2015, the

20  Department authorized Mr. Palomares to receive all medically necessary NF/AH Waiver

21  services even if the cost of those services would exceed the individual cost limits.

22  [D85.] Specifically, every thirty days, Mr. Palomares is authorized to receive (1) 283

23  hours of IHSS services; (2) 437 Waiver Personal Care Services hours; and (3) two hours

24  of case management services provided by an R.N. [D86.] The combined total of IHSS

25  (283) hours and Waiver Personal Care Services (437) is 720 hours. [D87.] In other

26  words, Mr. Palomares is authorized to receive up to 24 hours of care daily for each day

27  of the 30 day authorization month. *Id*. The Department will continue to authorize all

28  medically necessary NF/AH Waiver services for Mr. Palomares, even if the services

would exceed the individual cost limit for his level of care. [D88.] On December 2, 2015, the Department sent a letter, reiterating that: "If the cost of Mr. Palomares' medically necessary Waiver services exceed the Waiver's current individual cost limit, the State will continue to pay for those medically necessary Waiver services." [D89.] Thus, there is a material dispute as to the facts pertaining to Plaintiff Palomares.

### 7. Plaintiffs: Oct. 7, 2015 Letters to Plaintiffs and Subsequent Actions

Almost one year after this litigation was filed, each Plaintiff received a letter from DHCS, dated October 7, 2015, authorizing NF/AH Waiver services over the cost limit for their levels of care effective October 1, 2015. [P173-179, P221-229, P293-298]; Pls.' Ex. 20, Pls.' Ex. 21, Pls.' Ex. 47. For example, Mr. Thomas' letter authorized 450 hours of LVN private duty nursing, 2 hours of Registered Nurse ("RN") case management services, and 283 hours of IHSS per month. [P173]; Pls.' Ex. 47. *See also* [P221]; Pls.' Ex. 20; Schupp Dep. 84:16-86:7 (416 hours per month of LVN care, 2 hours per month of RN case management, and 283 hours per month of IHSS for Mr. Benison).[9] *See also* [P293]; Pls.' Ex. 21; Schupp Dep. 86:15-87:24 (437 hours of WPCS, 283 hours of IHSS, and 2 hours of RN case management for Mr. Palomares). Plaintiffs are the only Waiver recipients who have received such letters authorizing services over the cost limit. [P321-322]; Schupp Dep. 88:7-19. Defendants refused in discovery to explain why the letters were issued. Schupp Dep. 85:22-86:3. The October 7 letters to the three Plaintiffs did not include any duration for these authorizations. [P319-320]; Pls.' Ex. 20, Pls.' Ex. 21, Pls.' Ex. 47. As for "any additional requests for services in the future," the October 7 letters stated that "DHCS will review them and approve services based on your updated Plan(s) of Care, physician's orders, and other pertinent documentation showing that the services are medically necessary, and applicable law depending on the type of services requested." [P175, 223, 295]; Pls' Ex. 20, Pls.' Ex. 21, Pls.' Ex. 47. Defendants' medical

---

[9] The October 7 letters to Plaintiffs Thomas and Benison did not authorize any additional services over what they were already receiving at that time. [P151, 153, 216, 218]; Thomas Dec. ¶ 14; 000726-735, 000736, 000737; SB000325-326, Defs.' Ex. 26 at 1, Defs.' Ex. 27 (Benison Authorizations).

*JERRY THOMAS ET AL. V. JENNIFER KENT, DHCS;* 14-CV-08013 FMO (AGRx)

expert, Dr. Dhamija, has opined that without the services approved in the October 7 letters, Plaintiffs are at "high" or "serious" risk of institutionalization. [P186, 187, 230, 299]; Dhamija Dep. Vol. II, 112:22-114:17, 152:11-21, 158:5-9.

Between September and November 2015, the three Plaintiffs submitted to DHCS updated requests for Waiver services signed by their physicians.  The Plan of Treatment submitted in September for Mr. Palomares, for instance, requested 2 hours of RN case management per month and 24 hours per day of "direct care" through a combination of WPCS and IHSS; this increase of 281 hours per month was authorized by DHCS in his October 7 letter. [P292-293]; Pls.' Ex. 33. *See also* [P180]; Pls.' Ex. 48 (POT for Mr. Thomas requested 24 hours per day of skilled nursing, and 2 hours per month of RN case management); [P207]; Defs.' Ex. 28 (Supplemental Physician's Order for Mr. Benison prescribed an increase from 416 to 480 hours per month of in-home nursing).

Each Plaintiff then received a second letter from DHCS dated December 2, 2015. [P183-184, 234-235, 301-302]; Pls.' Ex. 57, Pls.' Ex. 58; Defs.' Ex. 145. These letters state that upon completion of DHCS' review of the updated requests, Plaintiffs would be issued a Notice of Action, and, if any services are denied, they will have the opportunity to request a state administrative hearing. *Id.* The December 2 letters further stated that the "State will continue to pay for those medically necessary Waiver services" above the "Waiver's current individual cost limit" but added that "DHCS will continue to conduct utilization management to determine whether requested services are medically necessary and consistent with applicable law." *Id.*; [P315]. Again, Plaintiffs are the only Waiver participants who have received such letters. [P321-322]; Schupp Dep. 136:9-24.

To date, Mr. Thomas has not received any further communication from DHCS approving or denying his request for 24-hour nursing. Thomas Dec. ¶ 15. On February 26, 2016, DHCS sent Mr. Benison a letter authorizing "an additional 0.7 hours a day or either LVN or WPCS services" and states: "If you submit any additional requests for services in the future, DHCS will continue to conduct utilization management to determine whether any additional requested services are medically necessary and

26

consistent with applicable law." [P235.1]; DHCS 18525-18526. Mr. Benison remains without 46 hours per month of services to fulfill his need for 24-hour "direct care" services per day. [P235.3]. As for Mr. Palomares, the December 2 letter indicates that the services previously authorized in the October 7 letter are under review. [P301-302]; Pls.' Ex. 57. To date, he has not received a notice informing him of the outcome of this review. Palomares Dec. ¶ 16. Because his current authorization includes approximately 47 hours per month of non-direct care, it falls short of meeting his undisputed need for 24-hour direct care. [P297]; Pls.' Ex. 31 at JP000352; Baker Dep. 144:1-24.

### 8. Defendants: Oct. 7, 2015 Letters to Plaintiffs and Subsequent Actions

There are countless disputed facts that prevent summary judgment in this case. While Plaintiffs claim that Mr. Benison and Mr. Palomares require additional hours of care and that Mr. Thomas requires 24 hours of licensed vocational nurse care, the evidence presented by the Department establishes that such is not true. [D43, 45-49, 54, 60-62, 66-69, 74-75, and 82-84.] Although the Department continues to review Plaintiffs' most updated Plans of Treatment requesting additional services, as indicated in its December 2, 2015 letters to Plaintiffs, the Department has already authorized those services determined to be medically necessary.

- The Department has authorized Mr. Thomas to receive in excess of 24-hours per day of, around-the-clock, one-on-one direct care. [D64.] It is undisputed that Mr. Thomas receives more 1:1 attention at home than he did previously at the subacute facilities, where staffing limitations restrict the amount of 1:1 time that a nurse can spend with a single patient. [D49].

- The Department has authorized Mr. Benison to receive up to 24-hours, around-the-clock, one-on-one direct care. [D77, 78.]

- The Department has authorized Mr. Palomares to receive up to 24-hour, around-the-clock, one-on-one direct care. [D86, 87.]

### E. Despite Its Ad Hoc Exceptions, DHCS Has Not Changed Its Cost Limit Policies, Thereby Harming People with Disabilities

#### 1. Plaintiffs' Statement

While DHCS has recently made an exception for the three Plaintiffs, other individuals with disabilities have continued to be denied medically necessary NF/AH Waiver services due to Waiver cost limits. *See* Plaintiffs' Expert Report of Dr. Clarissa

Kripke, MD ("Kripke Report") at 2, 19-21; *see also* Toth Dec. ¶¶ 18-20, 23-24; Decs. of Sarah McKinney (ECF No. 183), Diane Frank (ECF No. 182), and Elissa Gershon (ECF No. 181 at ¶¶ 13-15) re Pltfs.' Opp. to Defs.' Motion to Stay. Kimberly Alvarez, for example, became severely disabled due to an amniotic embolism during her daughter's birth. Dec. of Linda Oleson ("Oleson Dec.") ¶¶ 2-3. In March, 2015, she was notified by DHCS that her in-home Waiver nursing would be cut 90 percent after DHCS reassessed her level of care and reduced her corresponding service budget. *Id.* at ¶¶ 1-3, 5-7, 9, 12-14. Despite evidence that Ms. Alvarez requires around the clock care, this cut would have left her without care for more than half the time and could have forced her family to place her in an institution. *Id.* at ¶¶ 12, 17-19, 21.

On January 6, 2016, DHCS took the position in Ms. Alvarez's administrative appeal that it cannot make an exception to Waiver requirements to provide Ms. Alvarez with services over her cost limit. *Id.* at ¶ 20; [P323]. Objecting to her challenge to Waiver cost limits, DHCS argued: "If Ms. Alvarez wishes to litigate an ADA challenge to the statutes and regulations governing the waiver process, such a challenge should be in a court of general jurisdiction and not in a fair hearing. An ADA challenge is outside this tribunal's jurisdiction." Oleson Dec. Ex. B 8:24-9:17, 12:1-10. Thus, for Waiver applicants and participants who are denied Waiver services they need to leave or avoid institutional placement, the administrative hearing process is futile without a change in DHCS' policies or legal position at such hearings. DHCS has given no indication it intends to make such a change. [WA-P72—WA-P76]; Schupp Dep. May 27 54:1-57:1.

## 2. Defendants' Statement

Any reference to other NF/AH Waiver participant is irrelevant in the instant action. Ms. Alvarez is not a named plaintiff, nor is this lawsuit a class action in which the alleged injuries of other Waiver participants can be evaluated and adjudicated. Case law is absolutely clear that class-wide relief cannot be granted in the absence of a class action.

Moreover, the purported injuries of vaguely defined "other individuals" cannot be

broadly assumed based upon the purported example of one other Waiver participant. Plaintiffs' claim that the Department has taken the position that it cannot make an exception to Waiver requirements to provide Ms. Alvarez with services over her cost limit, and that any request for an exception or reasonable accommodation must be brought in federal court, is inaccurate. Plaintiffs mischaracterized the Department's statement and took it out of context.  The Department took the position that the Department properly determined that Ms. Alvarez no longer met the criteria for sub-acute level of care. Instead, Ms. Alvarez was properly determined to qualify for NF-B level of care services under the NF/AH Waiver.  The Department has also steadfastly indicated that any dispute regarding Ms. Alvarez's benefits under the Waiver program should first be adjudicated through the administrative process, pursuant to the terms of the Waiver. [D95.] Accordingly, her administrative appeal of the Waiver benefits is currently pending.  [D95, 96.]

## III.    STATEMENT OF THE LAW

### A.    Pltfs.' Argument: The ADA, Section 504, and Gov't Code Section 11135 Prohibit Discrimination Against Individuals with Disabilities.

Title II of the ADA, which governs Medi-Cal, provides: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Public entities must make reasonable modifications in "policies, practices, or procedures" to avoid discrimination, unless the accommodation would fundamentally alter the nature of the program. 28 C.F.R. § 35.130(b)(7). Under the ADA, a "qualified individual with a disability" is a person who "with or without reasonable modifications to rules, policies or practices" meets the "essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131; 29 U.S.C. § 705(20) (Section 504).[10] Government Code § 11135 provides at least the

_____

[10] Because the ADA and Section 504 are "co-extensive", Plaintiffs' claims may be

1    same level of protections as Title II of the ADA. Cal. Gov't Code § 11135(b). Plaintiffs

2    are Medicaid recipients and qualified persons with disabilities. [P8]. Defendants are a

3    public entity that receives federal and state funds and its Director; DHCS is an entity

4    covered by the ADA, Section 504 and Section 11135. [P4-P7].

**B.    Plaintiffs' Argument:  DHCS' Imposition of Arbitrary and Illegal Cost Limits Violates Prohibitions Against Unjustified and Unnecessary Institutionalization.**

7         In enacting the ADA, Congress specifically found that segregation of persons with

8    disabilities, especially in institutions, is a prohibited form of discrimination. 42 U.S.C.

9    §§ 12101(a)(2), (3), (5), (b)(1). This "integration mandate" of the ADA and Section 504

10   requires public entities to "administer services, programs, and activities in the most

11   integrated setting appropriate to the needs of qualified individuals with disabilities."

12   28 C.F.R. § 35.130(d); 28 C.F.R. § 41.51(d). In its landmark *Olmstead v. L.C.* decision,

13   the U.S. Supreme Court interpreted the ADA as requiring persons with disabilities to be

14   served in the community when: 1) the state's treatment professionals have determined

15   that community placement is appropriate; 2) community placement is not opposed by the

16   affected individual; and 3) "the placement can be reasonably accommodated, taking into

17   account the resources available to the state and the needs of others with disabilities."

18   *Olmstead* at 587; *see* DOJ SOI at 3:5-4:11 (background and requirements of *Olmstead*).

19   Plaintiffs do not need to be currently institutionalized; risk of immediate or eventual

20   institutionalization is sufficient to bring an *Olmstead* claim. *M.R. v. Dreyfus,* 697 F.3d at

21   734-35; *see also Brantley* 656 F. Supp. 2d at 1170; DOJ SOI at 6:18-9:4.

22        Plaintiffs meet all three *Olmstead* requirements. First, they all have Plans of

23   Treatment, signed by their physicians, which set forth services that will allow them to

24   remain safely in their homes. [P121-125, P191-193, P207, P236, P241, P292]; Defs.' Ex.

25   27 (Benison POT); Defs.' Ex. 28 (Benison Supp. Physician's Order); Pls.' Ex. 48

26   (Thomas POT); Pls.' Ex. 33 (Palomares POT). Second, far from opposing community

28   _____
analyzed together. *M.R. v. Dreyfus* 697 F.3d 706, 733 (9th Cir. 2012); *Brantley v. Maxwell-Jolly*, 656 F.Supp.2d 1161, 1169 n.2 (N.D. Cal. 2009).

30

placement, these Plaintiffs are fighting to remain in their homes. Thomas Dec. ¶ 12; Palomares Dec. ¶ 17; Benison Dec ¶ 27. Third, Defendants can accommodate Plaintiffs' needs because offering them the services they need through the NF/AH Waiver rather than in institutions is reasonable and cost-effective. *See Townsend v. Quasim*, 328 F.3d 511, 518 (9th Cir. 2003) (HCBS waiver services offered to categorically needy Medicaid recipients must also be offered to medically needy group unless doing so would fundamentally alter the State's Medicaid program); *see generally* Harrington Supp. Rpt.

Plaintiffs in this case are much like the plaintiff in *Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599 (7th Cir. 2004), who required around-the-clock nursing and medical care as a result of brain cancer and a stroke. Because of the Illinois Medicaid HCBS waiver program's cost limit, Mr. Radaszewski was denied the 24 hour nursing care he needed. *Id*. at 612. The Seventh Circuit reversed a judgment for the State of Illinois, holding that "the integration mandate may well require the state to make reasonable modifications to the form of existing services in order to adapt them to community-integrated settings." *Id.* at 611. On remand, the district court found in Mr. Radaszewski's favor, and suggested that the state could approve services for him that exceed the nursing home rate or modify the waiver to help meet the community integration contemplated by *Olmstead. Radaszewski ex rel. Radaszewski v. Maram*, No. 01 C 995, 2008 WL 2097382 at *15 (N.D. Ill. Mar. 26, 2008).

Here, Defendants acknowledge that under the current Waiver terms, if Waiver participants' service costs exceed the Waiver cost limits, they would be disenrolled from the Waiver and face the risk of institutionalization. [P97, 101; *see* WA-P4]; Pls.' Ex. 56 (Communications with CMS re Waiver Amendment) at 7935, 13480; Waiver DHCS1458, 1460, 1721; Schupp Dep. 76:11-77:1; Brooks Dep. 13:15-15:15, 17:18-19:7; *see also* Pls.' Ex. 77 ("Currently, the cost neutrality limit requirements are applied individually to each NF/AH Waiver participant therefore limiting access to critically needed services and risking unnecessary institutionalization on a case by case basis."); *see generally* Harrington Supp. Rpt. 7-9. DHCS purports to grant exceptions to the cost

31

limits for Waiver participants so as to "ensure that they remain safely in their homes." [D19].  But this "opaque and unwritten" *ad hoc* exceptions policy was explicitly rejected by the Justice Department because it "does not 'ensure' that individuals who require additional care to remain in the community will have the necessary alternative services identified and put in place to avoid unnecessary institutionalization."  DOJ SOI at 6:13-17 (citing *Brantley* 656 F. Supp.2d at 1174); *see also* [P90.1].

The Justice Department has offered clear guidance for DHCS to meet its ADA obligations to Plaintiffs and other Waiver participants.  Simply put, DHCS must take adequate steps, including accounting for individual needs, to ensure that Waiver participants are not placed at serious risk of institutionalization.  DOJ SOI 4:12-6:17; DOJ Supp. SOI.  Defendants' <u>four</u> recent, and as yet unrealized, attempts to amend the current Waiver inexplicably do not do so.  *See supra* Section II.B.1.  Among the Waiver Amendment's many shortcomings are that DHCS: (a) still intends to rely on the current Waiver cost limits to authorize Waiver services (e.g., WA-P20, WA-P63, WA-P81); (b) has no written policies and procedures for the Waiver Amendment and has no idea if any will be developed (e.g., WA-P35—WA-P40, WA-P44—WA-P62, WA-P67); (c) does not intend to inform Waiver participants and others about the Amendment (WA-P68—WA-P76); and (d) does not gather, tabulate, or analyze any data on rates of institutionalization pertaining to the Waiver Amendment (e.g., WA-P24, WA-P25.1, WA-P84; Schupp Dep. May 17 173:9-18).  The known Waiver Renewal information also shows no indication that DHCS intends to meet its ADA obligations insofar as the individual cost limits will persist.  Waiver Renewal Proposal at DHCS16786.

While DHCS continues its byzantine machinations to moot this lawsuit, the three Plaintiffs remain at serious risk of institutionalization even with DHCS' authorization of some services over the cost limits.  *See*, DOJ SOI at 6:20-23 ("...the at-risk inquiry is not focused on a plaintiff's past or immediate circumstances, in isolation, but rather on the ultimate question of the likelihood of a *future* institutionalization." (italics in original)).  First, DHCS has <u>not</u> authorized all the services that Plaintiffs' doctors have

recommended, and all remain without medically necessary direct care at the present time. *See* [P180], Pls.' Ex. 48 (Thomas Plan of Care 10/14/15); [P233], Defs.' Ex. 28 (Supp. Physician's Order), Benison Dec. ¶25; [P297], Pls.' Ex. 31 (Palomares MOHS 6/4/15). Second, Defendants refuse to commit to provide Plaintiffs with ongoing services, or even any information about how the proposed Waiver Amendment and Renewal might affect them. [P316-317, P319, WA-P95, WA-P100, WA-P105, WA-P110, D34-D35]; Schupp Dep. May 27 63:22-65:7. Third, Defendants admit that that the letters to Plaintiffs authorizing services over their cost limits have nothing to do with the Waiver Amendment. [WA-P96—WA-P99, WA-P101—WA-P104, WA-P106—WA-P109]; Schupp Dep. May 27 39:16-44:16. These facts, as well as applicable legal standards, establish that this case remains a live controversy. *Guggenberger v. Minnesota*, CV 15-3439 (DWF/BRT), 2016 WL 4098562, at \*7 (D. Minn. July 28, 2016) (Plaintiffs' *Olmstead* claims based on Waiver waitlist were not moot despite state's "evolving implementation" of measures to reduce waitlist.).

Plaintiffs unquestionably need NF/AH Waiver services to remain safely at home. In the opinion of Defendants' own medical expert, Plaintiffs are at "high risk" of institutionalization if they do not continue to receive the services for which they are currently authorized—services which exceed the cost limits for their level of care. [P186-P187, P230, P299]; Dhamija Dep. Vol. II, 112:22-114:17, 152:11-21, 158:5-9; Pls.' Ex. 70 (Dhamija Reb. Rpt.) at 7-8. Plaintiffs also need to be able to receive additional services when and if their conditions worsen. *Id.*; [P147, P205, P243]; Dhamija Dep. Vol. II, 134:10-16, 158:2-13; Pls.' Ex. 70 (Dhamija Reb. Rpt.) at 18-19.

As in *Radaszewski*, Plaintiffs are not asking Defendants to fund a service that they otherwise would not fund in an institutional setting—namely, 24-hour care. Plaintiffs simply ask that they not be subject to arbitrary cost restrictions for services in the community that would not apply if they were housed in institutions. Accordingly, Plaintiffs must prevail on the merits of their "integration mandate" claim.

**C.    Defendants' Response: The Department Is Not in Violation of the**

33

### Integration Mandate

#### 1. Plaintiffs' Claim Is Moot

Plaintiffs seek only declaratory relief in this case. The Supreme Court has instructed that the test for mootness in which the plaintiffs seek declaratory relief is "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Biodiversity Legal Foundation v. Badgley*, 309 F.3d 1166, 1174-75 (9th Cir. 2002) (quoting *Maryland Casualty Co. v. Pacific & Oil, Co.*, 312 U.S. 270, 273, 61 S. Ct. 510, 85 L. Ed. 826 (1941).) Stated another way, the "central question" is whether "changes in the circumstances that prevailed at the beginning have forestalled any occasion for meaningful relief." *Gator.com Corp. v. L.L. Bean, Inc.*, 398 F.3d 1125, 1129 (9th Cir. 2005) (en banc) (quoting *West v. Sec'y of the Dep't of Transp.*, 206 F.3d 920, 925, n.4 (9th Cir. 2000).

The Ninth Circuit explained that "[w]here the activities the plaintiff seeks to enjoin has already occurred, the court cannot undo what is already done, the action is moot and no action can be granted." *Friends of the Earth, Inc. v. Bergland*, 576 F.2d 1377, 1379 (9th Cir. 1978). The SAC alleges that Defendants violate the ADA and the Rehabilitation Act because of the cost limits in the Waiver. SAC, ¶¶ 5, 10, 130, 132, 133, and 142-144, ECF No. 70. In both the proposed Waiver amendment and the Waiver renewal proposal, the Department has proposed to remove the complained individual cost limits from the Waiver. [D100-102, D145.] The proposed Waiver amendment is now pending CMS's review, and the Waiver renewal application will soon be submitted to CMS for review. [D32, D130.] Control over the details of the Waiver rests with CMS. As such, based upon well-established law regarding mootness and the fact details of the Waiver rests with CMS, the case is now moot.

This Court should not issue any injunctive relief because the Department has already proposed to remove the cost limits from the Waiver in both the Waiver Amendment and the Waiver renewal proposal. As such, any judicial pronouncement by

1   this Court, regarding the cost limits, will be an advisory opinion, prohibited by the

2   Constitution.  *McQuillion v. Schwarzenegger*, 369 F.3d 1091, 1095 (9th Cir. 1991).

3   Also, declaratory judgment regarding the cost limits without the possibility of

4   prospective effect would be superfluous.  *McQuillion*, *supra*, 369 F.3d 1095 (citing

5   *Green v. Branson*, 108 F.3d 1296, 1300 (10th Cir. 1997).

6                    2.     <u>Plaintiffs are Not at "Serious Risk" of Institutionalization, Because
                            They are Authorized for All Medically Necessary Services to Remain
7                           Safe in Their Homes</u>

8          Plaintiffs' claim that "while [the Department] continues its byzantine machination

9   to moot this lawsuit, the three Plaintiffs remain at serious risk of institutionalization" is

10  disputed as a matter of law and fact.  To state a claim under the integration mandate of

11  the ADA and Section 504 of the Rehabilitation Act, Plaintiffs must "show that the

12  challenged state action creates a serious risk of institutionalization."  *M.R.*, 697 F.3d at

13  734. Plaintiffs, however, have not shown, and cannot show, that they are at serious risk

14  of institutionalization due to the NF/AH Waiver individual cost limits. [D43, 45-49, 54,

15  60-62, 66-69, 74-75, and 82-84.] This is because the Department has authorized all

16  medically necessary Waiver services to allow Plaintiffs to remain safely in their homes,

17  even if those services exceed the individual cost limits. *See* Pls.' Exhs. 20, 21, 47. As of

18  October 1, 2015, the Department has authorized all three Plaintiffs to receive at least 24

19  hours of care per day. *See id*. For Thomas, it is even more than 24 hours of direct care

20  per day. [D64.] Because Plaintiffs had been and are currently authorized to receive all

21  services necessary to remain safely in their homes, they face no risk of

22  institutionalization, let alone a "serious risk," due to the NF/AH Waiver individual cost

23  limits. (MSJ at 31).

24         Dr. Dhamija confirmed that Plaintiffs are not at serious risk of institutionalization

25  with their currently authorized services. As a Senior Physician at Rancho Los Amigos

26  National Rehabilitation Center, Dr. Dhamija is the Chief of Nephrology Division and

27  Chief of Medical and Surgical System of Care. [D58, D59.]. In those roles, he serves

28  many patients who have similar medical conditions as Plaintiffs. From his review of the

medical record and in-person assessment of Mr. Thomas, Dr. Dhamija found that Plaintiffs have had "no recent acute medical events reported requiring hospitalizations or other observed medical negligence requiring institutionalization or higher level of care." Pls. Ex. 70, Dhamija Rebuttal Rpt. at 5. Accordingly, he concluded that with their currently authorized services, Mr. Benison, Mr. Palomares, and Mr. Thomas are being safely cared for in their homes. *Id.* at 5, 6, 18. To the extent Plaintiffs' physicians or experts disagree with Dr. Dhamija, there is a genuine issue of material fact, which per se defeats Plaintiffs' MSJ. *See* Fed. R. Civ. P. 56(a). Plaintiffs' contention that they are fighting to remain in their homes is vehemently disputed and contradicted by the evidence.  [D43, 45-49, 54, 60-62, 66-69, 74-75, and 82-84.]

### 3.  There Is No Evidence of Any Risk of Any Future Institutionalization

The inquiry of whether a plaintiff is at risk of institutionalization can focus on an individual's past or current stability in the community. Those circumstances inform the assessment of whether an individual is at serious risk of entering an institutionalization. For instance, to determine whether there was any risk of institutionalization, one Court noted that the plaintiff had been hospitalized three times in 10 months "either directly or indirectly [as] a result of not receiving the adequate in-home health care services." *Cruz v. Dudek*, 2010 WL 4284955, at *3 (2010). Such circumstance is far from being the case for Plaintiffs here. In contrast to repeat hospitalization, Plaintiffs have been well cared for and have remained safely in their homes.  [D43, 45-49, 54, 60-62, 66-69, 74-75, and 82-84.] There have been no acute medical events requiring hospitalization. [D84.]

The absence of any risk of institutionalization for Plaintiffs will continue given the Department's commitment to authorize all medically necessary services under the Waiver for Plaintiffs regardless of the individual cost limits, pending approval of the Waiver amendment and renewal, which eliminate the cost limits. At the very minimum, there is a material dispute regarding whether Plaintiffs are at any risk of future institutionalization, which precludes the grant of summary judgment. Unable to show any risk of institutionalization based upon Plaintiffs' past and current medical

36

conditions, Plaintiffs resort to irrelevant factors as support of the alleged risk of future institutionalization: (1) that the Department has not authorized all the services that Plaintiffs' doctors have recommended, and all remain without medically necessary direct care at the present time; (2) that Defendants refuse to guarantee that even Plaintiffs' currently authorized services will continue beyond December 31, 2016; (3) that Defendants cannot provide any information about how the proposed Waiver amendment might affect Plaintiffs, including whether any of its provisions would be applicable to them after it expires on December 31, 2016; and (4) that Defendants allegedly admitted that that the letters to Plaintiffs authorizing services over their cost limits have nothing to do with the Waiver amendment. (MSJ at 31-32.)  Plaintiffs' claims are unsupported and disputed. Each and every one of these material facts that Plaintiffs allege in support of their claim is absolutely disputed.

First, clear evidence shows that the Department has authorized all medically necessary Waiver services for Plaintiffs to remain safely in their homes. [D43, 45-49, 54, 60-62, 66-69, 74-75, and 82-84.] Thus Defendants clearly dispute Plaintiffs' allegation that they are subject to future institutionalization because they have not been authorized medically necessary services. Further, contrary to Plaintiffs' claim, the Department's authorization of services under the Waiver is not based solely upon the request of the participants' personal doctors. The criterion for authorizing Waiver services is and has always been based upon medically necessity. Cal. Welf. & Inst. Code § 14059.5 (West 2016). In that regard, as the Supreme Court noted, the State has the subject matter expertise and experience and may rely on the reasonable assessments of its own professionals in determining whether an individual "meets the essential eligibility requirements." *Olmstead v. Zimring*, 527 U.S. 581, 602 (1999). Accordingly, the Department staff re-assess the Waiver participants' levels of care and medical needs on a regular basis and consider the medical needs of each participant enrolled in the Waiver in authorizing services. [D20, 21.] In addition, to the extent Plaintiffs assert that they are not receiving some services recommended by their personal doctors, a federal court is

not a necessary or proper forum for adjudicating those claims. Because Plaintiffs are no longer subject to the Waiver individual cost limits – any purported disputes related to Plaintiffs' current service authorizations involve only questions of whether the services are medically necessary. Such questions do not implicate the ADA or Section 504, and are purely questions of state law. Cal. Welf. & Inst. Code § 14059.5 (West 2016).

Second, the proposed Waiver amendment is subject to CMS's approval. [D130.] As such, Defendants naturally cannot predict the effects of any Waiver amendment upon Plaintiffs. However, the submitted Waiver amendment eliminates the individual cost limits, which forms the basis for all of Plaintiffs' claims in the SAC: (1) that the Director has discriminated against Plaintiffs by arbitrarily setting cost limits for the Waiver program (SAC, ¶ 130, ECF No. 70); (2) that the Director has failed to increase or eliminate the individual cost limits (SAC, ¶ 131, ECF No. 70); (3) that the Director has denied Plaintiffs adequate and necessary Waiver services commensurate with their actual needs because of the cost limits (SAC, ¶ 132, ECF No. 70); and (4) that the Director has designed and utilized the cost limits in implementing the Waiver program which have subjected Plaintiffs, individuals with disabilities, to discrimination (SAC, ¶ 133, ECF No. 70). The alleged violations of Section 504 of the Rehabilitation Act are based upon the same four grounds.  SAC, ¶¶ 142-144, ECF No. 70.  The same is true of the alleged violations of California Government Code sections 11135 and 11139. SAC, ¶ 152, ECF No. 70.

Under the June 27, 2016 proposed Waiver amendment, there will not be any limitation to the cost of participants' Waiver services so long as the requested services are medically necessary. [D110-113.] Also under the proposed Waiver amendment and as is the case for the current Waiver, a participant has an administrative remedy if that participant does not agree with the Department's decision on the requested services. [D114-129.] If the proposed Waiver amendment is approved by CMS, the Department will conduct the appropriate training and take the necessary steps in order implement the Waiver amendment. [D131.] As for services beyond December 31, 2016, the Department

1   is in the process of renewing the Waiver. [D29.] The proposed Waiver renewal, which

2   the Department released for public review and comment on June 10, 2016, after

3   stakeholder input from public in-person and workgroup meetings that were attended by

4   Mrs. Thomas and representatives from Disability Rights California, which is

5   representing Plaintiffs [D30-31, D132, D134.] also proposes to eliminate the individual

6   cost limits. [D145.] Public comments were accepted until July 29, 2016, followed by

7   additional stakeholder meetings. [D135, 137.] The final Waiver renewal proposal will be

8   submitted to CMS by October 2016, with the renewed Waiver projected to start on

9   January 1, 2017. [D138, 139.] In the meantime, pending the approval of the proposed

10  Waiver amendment and the Waiver renewal, the Department continues to authorize

11  medically necessary services under the Waiver regardless of the cost limits so that

12  participants can safely remain in their homes. [D65, 80, 88, 90, 91.] Accordingly,

13  Plaintiffs are not subjected to any risk of future institutionalization.

14        Third, the Department's letters to Plaintiffs are unrelated to the proposed Waiver

15  amendment. The proposed Waiver amendment was submitted to CMS specifically to

16  address the impact that the implementation of the Fair Labor Standards Act overtime

17  rules would have on Waiver participants. [D98.] In contrast, the letters were sent to

18  inform Plaintiffs that the Department will continue to authorize their medically necessary

19  services under the Waiver regardless of the individual cost limits. The Department may

20  authorize services above the individual cost limits pursuant to its own independent

21  authority to authorize medically necessary services for California residents. [D22.] In

22  fact, the Department has authorized medically necessary waiver services in excess of the

23  individual cost limits for over 400 Waiver participants. [D19, 90-93.] As the letters made

24  clear, the Department will continue to authorize medically necessary Waiver services,

25  even though the cost of those services may exceed the individual cost limits. [D65, 80,

26  88.] This effectively eliminates any future risk that Plaintiffs will be institutionalized due

27  to NF/AH Waiver individual cost limits, as well as any possibility that Plaintiffs might

28  be disenrolled from the Waiver because of the cost limits.

Defendants' administration of the Waiver program has not violated the ADA, Section 504 of the Rehabilitation Act, or California Government Code section 11135 because the evidence establishes that the Waiver has provided Plaintiffs with the medically necessary Waiver services to remain safely in the community and has not subjected Plaintiffs to any possibility of disenrollment from the program. [D152-172.] Accordingly, Defendants have not subjected Plaintiffs to any "serious risk of institutionalization," a mandatory showing to establish a violation of the integration mandate of ADA and Section 504 of the Rehabilitation Act. Therefore, this is yet another area where material facts are in dispute and Plaintiffs' Motion must be denied.

4. <u>Plaintiffs' Criticisms of the Waiver Amendment Is Yet Another Example of the Material Facts in Dispute.</u>

Plaintiffs' criticisms of the proposed waiver amendment are yet another example of the material facts in dispute.  Plaintiffs criticize the proposed Waiver amendment as follows: (1) the Department intends to continue to rely upon the cost limits through the Waiver amendment, (2) there are no written policies or procedures for the implementation of the Waiver amendment, (3) the Department does not intend to inform participants and others about the amendment, and (4) the Department does not intend to gather, tabulate, or analyze the data on rates of institutionalization. (MSJ at 30.) Defendants clearly dispute those material facts, and Plaintiffs' characterization of them is disingenuous.

If the proposed Waiver amendment is approved by CMS, the Department, of course, will take the necessary steps and conduct the appropriate training in order to implement the Waiver amendment. [D131.] It makes no sense for the Department to plan and take implementation procedures when it does not yet know whether the proposed Waiver amendment will in fact be approved. Thus, Plaintiffs' factual contentions and any criticisms regarding the implementation of the proposed Waiver amendment are simply premature, unsupported, and very much in dispute.

With regard to the risk of institutionalization, if approved, the proposed Waiver Amendment will effectively formalize the Department's ongoing practice of providing

Waiver participants with all medically necessary Waiver services. The proposed Waiver amendment proposes to authorize services regardless of the cost so long as those services are medically necessary. [D110.] As a result, to the extent there is any reasonable possibility that Plaintiffs' services could be reduced in the future based on the current Waiver individual cost limits (which there is not given the Department's unequivocal statements and actions), the proposed Waiver amendment, if approved, will eliminate any such possibility for the term of the current Waiver. Similarly, the Waiver renewal proposal, if approved, will eliminate any such possibility beyond the life of the current Waiver. The Department has met the Plaintiffs' needs and intends to continue to do so, even as the existing program rules are about to expire by their own terms and the new program rules are being developed in a public process. What Plaintiffs seem to want, in contrast, is a program with no rules applicable to them.

5. <u>There Is No Evidence that Anyone Was or Will Be Disenrolled from the Waiver Because of the Individual Cost Limits</u>

Defendants absolutely dispute Plaintiffs' statement that "Defendants acknowledge that under the current Waiver terms, if Waiver participants' service costs exceed the Waiver cost limits, they would be disenrolled from the Waiver and face the risk of institutionalization." There is no evidence whatsoever to show that any Waiver participant was ever disenrolled from the Waiver because of the individual cost limits. [D94.] There is also no evidence to demonstrate any disenrollment because of the individual cost limits. Any claim to the contrary is based solely upon speculation.

6. <u>Plaintiffs' Reliance on *Radaszewski* and *Townsend* is Misplaced</u>

The case law relied on by Plaintiffs is inapposite. Indeed, rather than provide support for Plaintiffs' claims, the cases actually show that the Department is in compliance with the integration mandate. In *Radaszewski*, for example, the State of Illinois outright refused to authorize the services necessary for the plaintiff to remain in his home, arguing that doing so would "impose an unreasonable burden on the state or fundamentally alter the nature of its programs and services." *Radaszewski*, 2008 WL 2097382, at *15. Here, in contrast, the Department has authorized Plaintiffs for all

medically necessary Waiver services to remain safe in their homes. [D63, 77, 85]; Pls.'
Exhs. 20, 21, 47; Dhamija Rebuttal Rpt. at 5, 6, 18.  If the cost of those medically
necessary Waiver services exceeds the NF/AH Waiver's current individual cost limit, the
Department will continue to pay for those medically necessary Waiver services. [D65,
80, 88]; Pls.' Exhs. 57, 58; Defs.' Exh. 145.  This is true of Plaintiffs' current Waiver
service requests, as well as future requests.  *Id.*  As such, the Department is already
doing exactly what the Seventh Circuit ordered Illinois to do: approve services in excess
of the individual cost limits imposed by the waiver program. *See Radaszewski*, 2008 WL
2097382, at *15. Further, it has also done so for over 400 other NF/AH waiver
participants.  [D19.]

   The Department similarly is already providing Plaintiffs the relief sought in
*Townsend*, 328 F.3d 511. There, the plaintiff challenged the State of Washington's
requirement that certain medical services be provided in an institution, rather than at
home or in a community-based setting. *Id*. at 517 ("Mr. Townsend simply requests that
the services he is already eligible to receive under an existing state program . . . be
provided in the community-based adult home where he lives, rather than the nursing
home setting the state requires."). Here, in contrast, Plaintiffs are authorized to receive
all their services at home, and the Department has never claimed that they are required to
be institutionalized to receive such services. [D65, 80, 88]. In fact, Mr. Thomas and Mr.
Benison are authorized for more NF/AH waiver services than they would likely receive
in an institution. They are authorized for up to 15 and 13.8 private duty nursing hours per
day, respectively. Pls.' Exhs. 20, 47. This is significantly greater than the care they
would receive in an institution, at which they could receive as few as 3.2 nursing hours
per day. Cal. Welf. & Inst. Code §14126.022(f)(1) (West 2015) and Cal. Health & Safety
Code §1276.5 (West 2015).  In short, the Department is actually going above and beyond
what the *Townsend* plaintiff requested.

   **D.    Plaintiffs' Argument: Defendants' Discriminatory Actions Further
         Violate the ADA, Placing Plaintiffs and Others at Risk of
         Institutionalization**

The ADA and Section 504 prohibit discriminatory "methods of administration" (28 C.F.R. § 35.130(b)(3) and the imposition of illegal eligibility criteria. 28 C.F.R. § 35.130(b)(8); 45 C.F.R. § 84.4(b)(1)(iv). DHCS' discriminatory administration of the NF/AH Waiver program violates these provisions, thereby placing Plaintiffs and others at serious risk of institutionalization. Defendants' violations of the law include: setting individual cost limits for NF/AH Waiver services significantly below comparable institutional rates—without any comparable annual rate increases or approved, standardized exception process or criteria; and forcing Waiver participants whose service needs cannot be met at their individual cost limit to choose lower cost services (such as unlicensed attendant care instead of licensed nursing), to go without needed Waiver services (e.g., 24-hour coverage), to be disenrolled from the Waiver, and/or be placed in institutions. *See supra,* Sections II.B-E.

DHCS has significant latitude in the development and administration of the Waiver. [P22-P23]. In the current Waiver, in four attempts at amending it, and in its proposal to renew it, DHCS fails to use its discretion in a manner that furthers, rather than undermines, its non-discrimination obligations. As the Seventh Circuit observed in a similar case, "…the state creates the waiver programs, and therefore those programs' eligibility criteria. If the state's own criteria could prevent the enforcement of the integration mandate, the mandate would be meaningless…It cannot avoid the integration mandate by binding its hands in its own red tape." *Steimel*, 2016 WL 2731505, at *11.

In *Steimel,* the plaintiffs received community-based services through an HCBS Waiver which did not contain cost limits. When the State of Indiana changed the eligibility criteria for the waiver, plaintiffs were switched onto another HCBS Waiver, which imposed cost limits on community services. The Seventh Circuit reversed a finding of summary judgment for the state, holding that:

> … the state cannot avoid the integration mandate by painting itself into a corner and then lamenting the view. The state designs, applies for, develops policies regarding, and executes its waiver programs. If those programs in

1  practice [restrict plaintiffs' community access]… or render them at serious

2  risk of institutionalization, then those programs violate the integration

3  mandate unless the state can show that changing them would require a

4  fundamental alteration of its programs for the disabled.

5  *Steimel*, 2016 WL 2731505, at *13.  Here, DHCS' actions place Plaintiffs and others at

6  risk of institutionalization, thus defeating or substantially impairing the very purpose of

7  the NF/AH Waiver program -- to offer an alternative to Medi-Cal funded institutional

8  care "that will safely meet [Waiver participants'] medical care needs." [P24]; Waiver at

9  DHCS 1438.  Plaintiffs should prevail on their "methods of administration" and

10  "imposition of illegal eligibility criteria" claims. SAC ¶¶ 132-133, 143-144, 152-153.

### E.  Defendants' Response: The Department Does Not Employ Methods of Administration that Result in Discrimination

#### 1.  The Department Has Neither Discriminated Against Plaintiffs Nor Placed Anyone at Risk of Institutionalization

14  The Department has not subjected Plaintiffs to discrimination on the basis of their

15  disability. Plaintiffs have not been denied access to the NF/AH Waiver program; are not

16  forced to choose lower cost services; have never been disenrolled from the NF/AH

17  Waiver; have not been placed in institutions since enrolling in the NF/AH Waiver; and

18  are not at risk of institutionalization based on the NF/AH Waiver individual cost limits.

19  These material facts are absolutely in dispute and Plaintiffs provide no specific evidence

20  to the contrary.[11]  As discussed in detail in response to Section III(B), Plaintiffs are

21  authorized to receive and have received all medically necessary Waiver services to allow

22  them to remain safely in their homes, even though the cost of providing these services

23  may exceed the waiver's individual cost limits. The evidence shows that Plaintiffs are

24  well cared for and safe in their homes with their currently authorized services. [D60, 61,

25  75, 82, 83].

26  The evidence shows that the Department has consistently and repeatedly taken

---

[11] Rather than citing or relying on any specific evidence in support of their methods of administration claim, Plaintiffs include a single citation to "Sections II.B–E."

44

steps to ensure that Plaintiffs were enrolled and remain enrolled in the NF/AH Waiver program and continue to receive medically necessary Waiver services in their homes. Plaintiffs are current participants of the NF/AH Waiver program, and have been so for several years. Mr. Palomares, for example, has participated in the NF/AH Waiver program continuously since 2007.  [P259.] Mr. Thomas and Mr. Benison have participated in the NF/AH Waiver program continuously since 2013. [P148; P208]. Plaintiffs were never denied entry to the NF/AH Waiver program based on individual cost limits. [D25.] Nor have they been disenrolled from the NF/AH Waiver program or institutionalized since entering the NF/AH Waiver program. [D26.] In fact, Plaintiff offers absolutely no evidence that the Department has ever disenrolled any Waiver participant from the NF/AH Waiver due to the individual cost limits. [D26, 94.]

With regard to "others," those allegations cannot stand.  This case was not filed as a class action.  It is not certified as such.  In the past two years, Plaintiffs have never moved to certify a class pursuant to Federal Rule of Civil Procedure 23.  As a non-class action suit, Plaintiffs lack standing to pursue claims based on injuries of non-parties.  *See Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("[T]he plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."); *Ray Charles Found v. Robinson*, 795 F.3d 1109, 1118 (9th Cir. 2015) ("[C]ourts have treated the limitation on third-party standing as a prudential principle that requires plaintiffs to assert their own legal rights."); *McMichael v. Napa Cty.*, 709 F.2d 1268, 1270 (9th Cir. 1983) (quoting *Warth*, 795 F.3d at 1118).

2.    <u>The Department Has Not Defeated or Substantially Impaired the Purpose of the NF/AH Waiver Program</u>

The Department's actions demonstrate that it is fulfilling the purpose of the NF/AH Waiver by providing Plaintiffs the Waiver services they need to remain safe in their homes. [D4 (Waiver DHCS1438–39).] The Department has authorized all medically necessary Waiver services for Plaintiffs to remain safely in their homes, even though the cost of providing these services may exceed the waiver's individual cost limits. [D65, 80, 88] As a result, Plaintiffs have been, and remain, safely in their homes.

45

1   [D60, 61, 75, 82, 83]. They had not been and are not at risk of institutionalization.

2   Accordingly, the NF/AH Waiver, when combined with other available services and

3   support, continues to provide Plaintiffs a real alternative to institutional care.

4          3.   Plaintiffs' Reliance on the Claims of "Others" is Irrelevant

5         Plaintiffs attempt to piggyback on the possible claims of vaguely defined "others."

6   (Motion, at 42 and 43.) This case was not filed as a class action, and Plaintiffs have

7   never moved to certify a class pursuant to Federal Rule of Civil Procedure 23. In fact,

8   Plaintiffs would be hard-pressed to certify a class because each individual NF/AH

9   Waiver participant has different conditions, diagnoses, and circumstances. [D21]; *see*

10   Fed. R. Civ. P. 23(b)(3). Because this is not a class action, and because Plaintiffs have

11   not personally suffered harm, Plaintiffs lack standing to pursue claims based on injuries

12   of non-parties. *See Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("[T]he plaintiff generally

13   must assert his own legal rights and interests, and cannot rest his claim to relief on the

14   legal rights or interests of third parties."); *Ray Charles Found v. Robinson*, 795 F.3d

15   1109, 1118 (9th Cir. 2015) ("[C]ourts have treated the limitation on third-party standing

16   as a prudential principle that requires plaintiffs to assert their own legal rights.");

17   *McMichael v. Napa Cty.*, 709 F.2d 1268, 1270 (9th Cir. 1983) (quoting *Warth*, 795 F.3d

18   at 1118).

19        Courts have emphasized that, "[w]ithout a properly certified class, a court cannot

20   grant relief on a class-wide basis." *M.R.*, 697 F.3d 706, 738 citing *Zepeda v. INS*, 753

21   F.2d 719, 728 n.1 (9th Cir. 1985). "Relief cannot be granted to a class before an order

22   has been entered determining that class treatment is proper." *Zepeda*, 753 at 728 (citing

23   *David v. Romney*, 490 F.2d 1360, 1366 (3d Cir. 1974)). As stated above, this case is not

24   a class action. Plaintiffs have never moved for an order to certify a class. Absent class

25   treatment, it would be proper for this Court to refrain from granting any class-wide

26   relief, specifically, the requested relief for "others."

27        Plaintiffs' reliance on non-parties' speculative injuries as the basis of their claims

28   also has serious ethical and legal implications for the Department. The Department is

required by law to maintain the confidentiality of protected health information of NF/AH Waiver participants. *See* 42 U.S.C. § 1320d, *et seq*. While Plaintiffs have put their protected health information at issue by publicly filing this lawsuit, and did not request that the pleadings and documents be filed under seal, the unidentified "others" have not. Thus, the Department is prohibited from presenting evidence about specific medical conditions and services of those alleged "other" participants. Regardless, the evidence shows that these "others" have not been placed at risk of institutionalization due to the individual cost limits. This is true given the fact that the Department has authorized medically necessary waiver services in excess of the individual cost limits for over 400 waiver participants to ensure that they can remain safely in their homes. [D19]. Additionally, the Department is not aware of any individual who was disenrolled from the NF/AH Waiver program due to the individual cost limits. [D26]. Nor is there any evidence of any disenrollment due to the individual cost limits.  [D94.] Therefore, this very material issue is in dispute and Plaintiffs' Motion must be denied.

## F.   Defendants Have Violated Plaintiffs' Due Process Rights under the 14th Amendment as a Matter of Law.

### 1.   Plaintiffs' Argument

DHCS indisputably has no written criteria or policy to approve nursing, attendant care, or many other Waiver services above the cost limits. [P93, 94, 95]; King Dep. 104:4-11, 105:18-25; Defs.' Resp. to Pls.' Req. for Adm. No. 1 (3:2-26); *see also* Section II.B.1, *supra*, regarding the proposed Waiver Amendment and proposed Renewal. Nor does DHCS have a process for informing informed health care providers or Waiver participants, including Plaintiffs, about how to request services above the cost limits. [P92, 160]; King Dep. 107:25-108:17; Defs.' Resp. to Pls.' Req. for Adm. No. 14 (15:7-27); Benison Dec. ¶ 12; Palomares Dec. ¶ 11; Toth Dec. ¶¶ 21-23; *see also* Section II.B.1, *supra*. But DHCS has somehow authorized several hundred individuals to receive Waiver services above their cost limit. [P106]; Pls.' Ex. 56 at DHCS7935, 13479; Pls.' Ex. 63, DHCS9839-9840; *see also* Defs.' Resp. to Pls.' Req. for Adm. No. 2 (4:1-20). This is done in a manner that is patently arbitrary. *See* DOJ SOI at 6:5-17.

1    "[T]he establishment of written, objective, and ascertainable standards is an
2    elementary and intrinsic part of due process." *Baker-Chaput v. Cammett*, 406 F. Supp.
3    1134, 1140 (D.N.H. 1976).  Among the "procedural protections is the establishment of
4    clear ascertainable standards that 'insure fairness and ... avoid the risk of arbitrary
5    decision making.'" *K.W. v. Armstrong*, No. 1:12-cv-00022-BLW, 2016 WL 1254225, at
6    *8 (D. Idaho Mar. 28, 2016) (citation omitted).  "This absence of any ascertainable
7    standard for inclusion and exclusion is precisely what offends the Due Process Clause."
8    *Id,* quoting *Smith v. Goguen,* 415 U.S. 566, 578 (1974). The Ninth Circuit recently held
9    that due process rights attach to services available under another HCBS waiver program.
10   *K.W. ex rel. D.W. v. Armstrong*, 789 F.3d 962, 973 (9th Cir. 2015); *see also N.B. ex rel.*
11   *Peacock v. District of Columbia*, 794 F.3d 31, 41 (D.C. Cir. 2015) (Medicaid recipients
12   had due process property interest in prescription drug coverage not completely excluded
13   from Medicaid coverage). In *K.W..*, the Ninth Circuit ruled that the due process rights of
14   plaintiffs enrolled in Idaho's equivalent to the NF/AH waiver program were violated
15   when Idaho's Department of Health and Welfare ("IDHW") reduced plaintiffs' budgets
16   and, as a result, their level of services. *K.W. ex rel D.W.,* 789 F.3d at 973.  Holding that
17   the plaintiffs had a protected property interest in their benefits, the Ninth Circuit
18   reasoned that "once a lower budget is calculated, a participant has already effectively
19   been deprived of the right to receive the same level of services in the coming year." *Id.*
20   On remand the district court in *K.W.* found that the IDHW continued to violate the
21   participants' due process rights in part because it utilized an admittedly unreliable budget
22   tool for approving waiver services and in part because it utilized the vague standard of
23   "health and safety" to approve waiver services above the budgetary limits. *K.W.*, 2016
24   WL 1254225 at *9, 11. The district court ordered IDHW to "write standards defining the
25   phrase 'health and safety' and describ[e] the documentation and other material required
26   of the participant to satisfy that standard." *K.W.*, 2016 WL 1254225, at *9; *see also*
27   *Martinez v. Ibarra,* 759 F. Supp. 664, 668 (D. Colo. 1991) (medical review procedure
28   used to determine eligibility for home and community based waiver services was "never

1    articulated in clear, written standards" and thereby violated due process).

2    Plaintiffs' claims in this case are the same as those in *K.W.*— Defendants' lack of

3    written, objective, and ascertainable standards through which Plaintiffs and others may

4    understand the basis for decisions concerning their critically needed Medicaid benefits,

5    violates their due process rights. Moreover, Plaintiffs should not be required to appeal to

6    this Court to obtain relief from DHCS' standardless decisions. As the Ninth Circuit

7    stated in *K.W. ex rel.,* "[a] primary purpose of providing adequate notice to participants

8    is to enable them to prepare a defense for a hearing. It would be illogical if the

9    availability of a hearing deprived the Plaintiffs of their right to receive the notice they

10   need to challenge benefits reductions at that hearing." 789 F.3d at 973-74.

11   Here, DHCS has been well aware that Plaintiffs are challenging its discriminatory

12   administration of the NF/AH Waiver. SAC ¶¶ 129-133, 141-144, 151-153. Through

13   discovery, Plaintiffs have gathered undisputed evidence that not only establishes

14   Defendants' violations of the ADA and other disability laws, but also their violation of

15   their due process rights. Accordingly, pursuant to Rule 15(b), Plaintiffs request that their

16   Second Amended Complaint be amended to conform to proof at the hearing on their

17   motion for summary judgment with respect to their due process claim. *See Grisham v.*

18   *Philip Morris, Inc.*, 670 F. Supp. 2d 1014, 1022-23 (C.D. Cal. 2009), citing *Kaplan v.*

19   *Rose*, 49 F.3d 1363, 1370 (9th Cir. 1994) (new issues raised in summary judgment

20   motion can be treated as a request for leave to amend and such requests should be

21   liberally granted absent prejudice to defendants).

22                    2.    Defendants' Response

23   This is an entirely new argument and does not appear anywhere in the four corners

24   of the SAC. Plaintiffs should not be allowed to amend their SAC at this late stage given

25   that they have failed to provide good cause for their delay. Further, the proposed

26   amendment of the SAC to add the Due Process claim undoubtedly will cause severe

27   prejudice to Defendants, given that discovery is now closed. Being unable to conduct

28   further discovery, Plaintiffs are now forcing Defendants to formulate a defense and

*JERRY THOMAS ET AL. V. JENNIFER KENT, DHCS;* 14-CV-08013 FMO (AGRx)

1   respond to this proposed claim through Defendants' opposition to the MSJ.

2         Plaintiffs' reliance on *Grisham* to support amendment of their pleadings is

3   seriously misplaced. In that case, the implied motion to amend was in *opposition* papers

4   to a MSJ, not in the MSJ itself. Plaintiffs seek here not only to amend their pleading but

5   to have judgment on it, in a single filing. There is no authority for this bizarre result.

6   Equally important, the proposed amendment to the operative complaint will be futile.

7   Plaintiffs have not and will not be able to show any injury-in-fact. There is no evidence

8   that Plaintiffs have suffered any injury from the alleged violation of the Due Process

9   claim.

10  **IV.    CONCLUSION**

11        1.    Plaintiffs' Conclusion

12        The material facts in this case are undisputed. This Court should therefore rule

13  that, as a matter of law, Plaintiffs are entitled to summary judgment on all claims. This

14  Court should further grant declaratory relief that the individual cost limits for the NF/AH

15  Waiver violate the ADA, Section 504, Section 11135 and the Due Process Clause of the

16  U. S. Constitution. Finally, since this litigation started, Defendants have made various

17  unilateral attempts to circumvent the relief that Plaintiffs seek. Defendants have done so,

18  however, in a way that does not satisfy their ADA or due process obligations.

19  Accordingly, this Court should also order injunctive relief prohibiting Defendants from

20  enforcing individual cost limits or any other similar arbitrary or *ad hoc* cost limitation

21  for the NF/AH Waiver that violate the above-mentioned provisions of law, and ordering

22  them to develop and implement policies and procedures to provide services based on

23  individual need, without being impeded by improper and discriminatory cost restraints

24  that place Plaintiffs and others at risk of unnecessary institutionalization.

25        2.    Defendants' Conclusion

26        For the foregoing reasons, Defendants ask that the Court deny Plaintiffs' Motion

27  for Summary Judgment, and deny Plaintiffs' attempt to amend their Second Amended

28  Complaint.

*Jerry Thomas et al. v. Jennifer Kent, DHCS;* 14-CV-08013 FMO (AGRx)

Dated: September 7, 2016

Respectfully submitted,

DISABILITY RIGHTS CALIFORNIA
WESTERN CENTER ON LAW AND POVERTY

By: _____/s/_____
Elissa Gershon
Attorneys for Plaintiffs

Dated: September 7, 2016

ATTORNEY GENERAL OF CALIFORNIA

Kamala D. Harris
Attorney General of California
Jennifer M. Kim
Supervising Deputy Attorney General
Kenneth K. Wang
Michael T. Guitar
Deputy Attorney General

By: _____/s/_____
Kenneth K. Wang
Attorneys for Defendants Jennifer Kent and Department of Health Care Services

**FILER'S ATTESTATION**

I, Elissa Gershon, am the ECF user whose ID and password are being used to file this Parties' Joint Memorandum of Points and Authorities re: Plaintiffs' Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment, or in the Alternative, for an Order Treating Specified Facts as Established; and Defendants' Opposition Thereto.  In compliance with Local Rule 5-4.3.4(a)(2)(i), I hereby attest that KENNETH  K. WANG has concurred in and authorized this filing

Dated: September 7, 2016

By:_____/s/_____
        Elissa Gershon

*Jerry Thomas et al. v. Jennifer Kent, DHCS;* 14-CV-08013 FMO (AGRx)