1

2

3

4

5

6

7

8

9 **UNITED STATES DISTRICT COURT**

10 **CENTRAL DISTRICT OF CALIFORNIA**

11

12 JERRY THOMAS, et al.,                    )    Case No. CV 14-8013 FMO (AGRx)
                                          )
13               Plaintiffs,               )
                                          )
14        v.                              )    **ORDER RE: PLAINTIFFS' MOTION FOR**
                                          )    **SUMMARY JUDGMENT**
15 JENNIFER KENT, et al.,                  )
                                          )
16               Defendants.              )
                                          )
17 _____        )

18        Having reviewed and considered all the briefing filed with respect to the Motion for

19 Summary Judgment [] (Dkt. 193, "Motion") filed by plaintiffs Jerry Thomas ("Thomas"), Sean

20 Benison ("Benison"), and Juan Palomares ("Palomares") (collectively, "plaintiffs"), the court finds

21 that oral argument is not necessary to resolve the Motion, see Fed. R. Civ. P. 78; Local Rule 7-15;

22 Willis v. Pac. Mar. Ass'n, 244 F.3d 675, 684 n. 2 (9th Cir. 2001), and concludes as follows.

23                              **INTRODUCTION**

24        On October 23, 2014, plaintiffs filed this action against the California Department of Health

25 Care Services ("DHCS") and former DHCS Director, Toby Douglas.  (See Dkt. 4, Complaint).

26 Plaintiffs filed a First Amended Complaint on January 29, 2015, (see Dkt. 26, "FAC"), and the

27 operative Second Amended Complaint on July 7, 2015.  (See Dkt. 70, "SAC").  In the SAC,

28 plaintiffs assert three claims against DHCS and the current DHCS Director, Jennifer Kent

1   (collectively, "defendants") for violations of: (1) the Americans with Disabilities Act ("ADA"), 42

2   U.S.C. § 12131, et seq.; (2) the Rehabilitation Act, 29 U.S.C. § 794, et seq.; and (3) California

3   Government Code §§ 11135 & 11139.  (See id. at ¶¶ 124-153).

4                                    **BACKGROUND**

5          Plaintiffs are California residents who "all have significant physical disabilities and were

6   institutionalized but now live in their own homes with Medicaid-funded nursing and attendant

7   care[.]"  (See Dkt. 194, Parties' Joint Memorandum of Points and Authorities Re: Plaintiffs' Motion

8   for Summary Judgment [] ("Joint Br.") at 1).  "Medicaid, called Medi-Cal in California, is a joint

9   federal and state medical assistance program for eligible low-income people."  (Id. at 4).  Plaintiffs

10  receive home care pursuant to the Nursing Facility/Acute Hospital Home and Community-Based

11  Services Waiver program ("NF/AH Waiver" or "Waiver"), which "is intended to provide in-home

12  services for Medicaid recipients with disabilities who qualify for placement in nursing facilities and

13  other institutions."  (Id. at 1).  The NF/AH Waiver program is operated by the DHCS, (see id. at 6),

14  but its administration is overseen by a federal agency called the Centers for Medicare and

15  Medicaid ("CMS").  (See id. at 5).  In general, the DHCS cannot modify the Waiver program

16  without first submitting a proposal to, and obtaining approval from, the CMS.  (See id. at 5-7).

17         When the instant Motion was filed, the NF/AH Waiver program provided that eligible

18  patients "may receive services . . . if they require a level of care otherwise available in an

19  institution" such as a hospital or nursing facility.  (See Dkt. 112, Statement of Interest of the United

20  States of America ("SOI") at 2).  In that circumstance, the "cost of services available to" the patient

21  is "capped according to that individual's designated level of care."  (Id.).  "Although the caps

22  correspond to the type of institution in which the individual would otherwise receive services, the

23  Waiver caps are lower than the average cost of providing care in the corresponding institution."

24  (Id.).  Despite the Waiver's cost limits, defendants "have administered treatment plans for

25  individuals on the [W]aiver with costs in excess of the applicable limit." (Id.).  Here, the DHCS sent

26  letters to all three plaintiffs on December 2, 2015, stating that if the costs of plaintiffs' medically

27  necessary services exceed the Waiver's current individual cost limit, the DHCS will nonetheless

28  continue to pay for those services.  (See Dkt. 194, Joint Br. at 20, 22 & 25).

1    After the instant Motion was filed, the CMS approved an amendment to the Waiver

2    program. (See Dkt. 305, Defendants' Ex Parte Application to: Notify the Court of New Authority

3    [] ("Defs.' Application") at 4-5). The amendment "purports to remove the individual cost limitations"

4    from the Waiver program. (See Dkt. 171, Supplemental Statement of Interest of the United States

5    of America ("Supp. SOI") at 1). However, plaintiffs contend that the amendment "simply

6    embedded the cost limits into a different section of the Waiver document . . . and now calls them

7    'cost amounts'" instead of "cost limits." (See Dkt. 306, Plaintiffs' Opposition to Defendants' Ex

8    Parte Application to: Notify the Court of New Authority [] ("Pls.' Opp. to Defs.' Application") at 10).

9    Indeed, the amended Waiver program sets forth the same cost limit figures as it did before the

10   amendment took effect. (Compare Dkt. 305-2, Defs.' Application, Exh. A, Application for a 1915(c)

11   Home and Community-Based Services Waiver at ECF 31939 (amended Waiver program)

12   with Dkt. 197-22, Declaration of Elissa Gershon [] ("Gershon Decl."), Attachment ("Att.") 66,

13   Nursing Facility/Acute Hospital (NF/AH) Transition and Diversion Waiver at ECF 25149 (Waiver

14   program before amendment)).

15   According to plaintiffs, the amended NF/AH Waiver program will continue to encourage a

16   "practice of imposing individual cost limits far below institutional rates[,]" (see Dkt. 306, Pls.' Opp.

17   to Defs.' Application at 12), which forces participants "to utilize lower cost Waiver services (i.e.,

18   unlicensed attendant care instead of nurses) or reduce the amount of services the participant

19   receives." (Dkt. 194, Joint Br. at 7). In addition, plaintiffs state that "participants with service

20   needs in excess of the individual cost limits may also be disenrolled from the Waiver and 'will have

21   no other option but be admitted to nursing facilities to ensure their health and safety.'" (Id.).

22   Plaintiffs therefore "seek injunctive and declaratory relief . . . requiring Defendants to take steps

23   to ensure that Plaintiffs . . . can get the services they need to remain safely at home[.]" (Id. at 1).

24   Further, although the DHCS "has stated that Plaintiffs can receive all medically necessary

25   waiver services without regard to the cost limits[,]" (Dkt. 194, Joint Br. at 3), plaintiffs contend that

26   the DHCS "has still refused to approve all of the services recommended by their doctors." (Id. at

27   1). In late 2015, all three plaintiffs submitted updated requests for Waiver services to the DHCS.

28   (See id. at 26). The requests were signed by each of plaintiffs' treating physicians. (See id.). The

1    DHCS responded by sending letters to each plaintiff stating that it would continue paying for all

2    medically necessary Waiver services above the Waiver's cost limits, but that it also would

3    "continue to conduct utilization management to determine whether requested services [we]re

4    medically necessary and consistent with applicable law."  (Id.).  To date, the DHCS has not

5    provided plaintiffs with all the services identified in their 2015 requests.  (See id. at 26-27).

6    According to plaintiffs, "Benison remains without 46 hours per month of services to fulfill his need

7    for 24-hour 'direct care' services per day."  (Id. at 27).  Further, neither Thomas nor Palomares

8    have received any further communication regarding the outcome of the DHCS's review.  (See id.

9    at 26 & 27).

10                                          **LEGAL STANDARD**

11           Rule 56(a) of the Federal Rules of Civil Procedure authorizes the granting of summary

12   judgment "if the movant shows that there is no genuine dispute as to any material fact and the

13   movant is entitled to judgment as a matter of law."  The standard for granting a motion for

14   summary judgment is essentially the same as for granting a directed verdict.  See Anderson v.

15   Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511 (1986).  Judgment must be entered

16   "if, under the governing law, there can be but one reasonable conclusion as to the verdict."  Id.

17           The moving party has the initial burden of identifying relevant portions of the record that

18   demonstrate the absence of a fact or facts necessary for one or more essential elements of each

19   cause of action upon which the moving party seeks judgment.  See Celotex Corp. v. Catrett, 477

20   U.S. 317, 323, 106 S.Ct. 2548, 2553 (1986).  If the moving party fails to carry its initial burden of

21   production, "the nonmoving party has no obligation to produce anything."  Nissan Fire & Marine

22   Ins. Co., Ltd. v. Fritz Cos., Inc., 210 F.3d 1099, 1102-03 (9th Cir. 2000).

23           If the moving party has sustained its burden, the burden then shifts to the nonmovant to

24   identify specific facts, drawn from materials in the file, that demonstrate that there is a dispute as

25   to material facts on the elements that the moving party has contested.  See Celotex, 477 U.S. at

26   324, 106 S.Ct. at 2553; Anderson, 477 U.S. at 256, 106 S.Ct. at 2514 (a party opposing a properly

27   supported motion for summary judgment "must set forth specific facts showing that there is a

28

1  genuine issue for trial.").[1]  A factual dispute is material only if it affects the outcome of the litigation

2  and requires a trial to resolve the parties' differing versions of the truth.  SEC v. Seaboard Corp.,

3  677 F.2d 1301, 1306 (9th Cir. 1982).  Summary judgment must be granted for the moving party

4  if the nonmoving party "fails to make a showing sufficient to establish the existence of an element

5  essential to that party's case, and on which that party will bear the burden of proof at trial."

6  Celotex, 477 U.S. at 322, 106 S.Ct. at 2552; see Anderson, 477 U.S. at 252, 106 S.Ct. at 2512

7  (parties bear the same substantive burden of proof as would apply at a trial on the merits).

8        In determining whether a triable issue of material fact exists, the evidence must be

9  considered in the light most favorable to the nonmoving party.  See Barlow v. Ground, 943 F.2d

10  1132, 1134 (9th Cir. 1991), cert. denied, 505 U.S. 1206, 112 S.Ct. 2995 (1992).  However,

11  summary judgment cannot be avoided by relying solely on "conclusory allegations [in] an affidavit."

12  Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888, 110 S.Ct. 3177, 3188 (1990); see also Matsushita

13  Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986) (more

14  than a "metaphysical doubt" is required to establish a genuine issue of material fact).  "The mere

15  existence of a scintilla of evidence in support of the plaintiff's position" is insufficient to survive

16  summary judgment; "there must be evidence on which the [fact finder] could reasonably find for

17  the plaintiff."  Anderson, 477 U.S. at 252, 106 S.Ct. at 2512.

18                                              **DISCUSSION**

19        Plaintiffs contend that the NF/AH Waiver program violates the ADA, the Rehabilitation Act,

20  and California Government Code §§ 11135 & 11139 because its cost limits create a "serious risk

21  of institutionalization[.]"  (Dkt. 194, Joint Br. at 32 & 43).  The ADA provides that "no qualified

22  individual with a disability[2] shall, by reason of such disability, be excluded from participation in or

23

24        [1]  "In determining any motion for summary judgment or partial summary judgment, the Court
25  may assume that the material facts as claimed and adequately supported by the moving party are
    admitted to exist without controversy except to the extent that such material facts are (a) included
26  in the "Statement of Genuine Disputes" and (b) controverted by declaration or other written
    evidence filed in opposition to the motion."  Local Rule 56-3.
27

28        [2]  The ADA defines a "qualified individual with a disability" as "an individual with a disability
    who, with or without reasonable modifications to rules, policies, or practices, the removal of

1   be denied the benefits of the services, programs, or activities of a public entity, or be subjected

2   to discrimination by any such entity." 42 U.S.C. § 12132. "A public entity shall make reasonable

3   modifications in policies, practices, or procedures when the modifications are necessary to avoid

4   discrimination on the basis of disability, unless the public entity can demonstrate that making the

5   modifications would fundamentally alter the nature of the service, program, or activity."[3] 28 C.F.R.

6   § 35.130(b)(7)(i). "Because the applicable provisions of the ADA and the Rehabilitation Act are

7   'co-extensive,' [the court] discuss[es] both claims together, focusing on the ADA." M.R. v. Dreyfus,

8   697 F.3d 706, 733 (9th Cir. 2012). Similarly, California Government Code § 11135(b) affords the

9   same level of protections as the ADA. See Cal. Gov't Code § 11135(b) ("With respect to

10  discrimination on the basis of disability, [state] programs and activities . . . shall meet the

11  protections and prohibitions contained in . . . the federal Americans with Disabilities Act[.]").

12          In enacting the ADA, Congress found that "historically, society has tended to isolate and

13  segregate individuals with disabilities, and, despite some improvements, such forms of

14  discrimination against individuals with disabilities continue to be a serious and pervasive social

15  problem." 42 U.S.C. § 12101(a)(2). "Moreover, Congress found that discrimination against

16  individuals with disabilities persists in such critical areas as institutionalization, and that individuals

17  with disabilities continually encounter various forms of discrimination, including outright intentional

18  exclusion, failure to make modifications to existing facilities and practices, and segregation[.]"

19  Dreyfus, 697 F.3d at 733 (internal citation, quotation marks, and alteration marks omitted).

20

21

22  ───────────────

23  architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation

24  in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). It is undisputed that plaintiffs are all qualified individuals with disabilities within the meaning of the ADA. (See,

25  generally, Dkt. 194, Joint Br.).

26      [3]  Defendants have not raised a fundamental alteration defense in opposition to plaintiffs' Motion. (See, generally, Dkt. 194, Joint Br.; see also Dkt. 200, Defendants' Response to Second

27  Supplemental Statement of Interest [of the United States of America] at 1 ("Defendants did not intend to raise that defense in their opposition to Plaintiffs' third MSJ, and have not asserted it at

28  any other time during this case.")).

1  The Department of Justice ("DOJ") has promulgated regulations implementing the ADA,[4]

2  see 42 U.S.C. § 12134(a) (providing that "the Attorney General shall promulgate regulations . . .

3  that implement this part"), including "the so-called 'integration mandate,' providing that 'a public

4  entity shall administer services, programs, and activities in the most integrated setting appropriate

5  to the needs of qualified individuals with disabilities." Dreyfus, 697 F.3d at 733 (quoting 28 C.F.R.

6  § 35.130(d)) (internal alteration marks omitted).  To comply with the integration mandate, the

7  states must serve persons with disabilities in their community – rather than in institutions – when

8  "such placement is appropriate, the affected persons do not oppose such treatment, and the

9  placement can be reasonably accommodated, taking into account the resources available to the

10  State and the needs of others with . . . disabilities."  Olmstead v. L.C. ex rel. Zimring, 527 U.S.

11  581, 607, 119 S.Ct. 2176, 2190 (1999).

12  To prevail on a claim for a violation of the ADA's integration mandate, "a plaintiff need only

13  show that the challenged state action creates a serious risk of institutionalization." Dreyfus, 697

14  F.3d at 734 ("An ADA plaintiff need not show that institutionalization is 'inevitable' or that she has

15  'no choice' but to submit to institutional care in order to state a violation of the integration

16  mandate.").  In other words, a state violates the ADA's integration mandate when "a public entity's

17  failure to provide community services or its cut to such services will likely cause a decline in

18  health, safety, or welfare that would lead to the individual's eventual placement in an institution."

19  (Dkt. 112, SOI at 6-7); see, e.g., Oster v. Lightbourne, 2012 WL 691833, *16 (N.D. Cal. 2012)

20  (granting preliminary relief where "the evidence also show[ed] that Plaintiffs [we]re likely to

21  succeed in demonstrating that the loss of [in-home supportive services] hours [would] compromise

22  the health and well-being of [in-home supportive services] recipients such that they [would] be at

23  serious risk of institutionalization").

24  Cost limitations may violate the ADA if a state does not otherwise "'ensure' that individuals

25  who require additional care to remain in the community will have the necessary alternative

26  _____

27  [4]  The court "afford[s] DOJ's view considerable respect." Dreyfus, 697 F.3d at 734 ("Because
the Department is the agency directed by Congress to issue regulations implementing Title II of
28  the ADA, its views warrant respect.") (internal alteration marks omitted).

1  services identified and put in place to avoid unnecessary institutionalization."  (Dkt. 112, SOI at

2  6); see Brantley v. Maxwell-Jolly, 656 F.Supp.2d 1161, 1174 (N.D. Cal. 2009) (holding that

3  challenged state-wide reductions in adult day care services could have been ADA-complaint if the

4  state had "implement[ed] any means of ensuring that, if and when the cuts take effect, the

5  necessary alternative services [would] be identified and in place for Plaintiffs").  "Consistent with

6  this settled law, . . . courts have frequently intervened when a state's Medicaid services are

7  insufficient to ensure that individuals would continue to receive services in the most integrated

8  setting appropriate[.]"  (Dkt. 112, SOI at 7); see, e.g., Fisher v. Oklahoma Health Care Authority,

9  335 F.3d 1175, 1178-79 & 1182 (10th Cir. 2003) (holding that plaintiffs asserted valid ADA

10  challenge to Oklahoma waiver program's cap on five medically necessary prescriptions for

11  patients receiving community-based care "while continuing to provide unlimited prescriptions to

12  patients in nursing facilities" because the state did not allow waiver patients "to receive services

13  for which they [we]re qualified unless they agree[d] to enter a nursing home").

14        On the other hand, "[t]he State's responsibility, once it provides community-based treatment

15  to qualified persons with disabilities, is not boundless."  Olmstead, 527 U.S. at 603, 119 S.Ct. at

16  2188.  "[W]hen there is evidence that a State has in place a comprehensive deinstitutionalization

17  scheme, which, in light of existing budgetary constraints and the competing demands of other

18  services that the State provides, including the maintenance of institutional care facilities, is

19  'effectively working,' the courts will not tinker with that scheme."  Sanchez v. Johnson, 416 F.3d

20  1051, 1067-68 (9th Cir. 2005) (internal citations omitted).  "The Supreme Court has instructed

21  courts to . . . give states 'leeway' in administering services for the disabled."  Arc of Washington

22  State Inc. v. Braddock, 427 F.3d 615, 618 (9th Cir. 2005) ("Despite the integration mandate,

23  therefore, we have held that we normally 'will not tinker with' comprehensive, effective state

24  programs for providing care to the disabled.").

25        Here, there are genuine disputes of material fact as to whether the Waiver program's cost

26  limits create a "serious risk of institutionalization" for plaintiffs, see Dreyfus, 697 F.3d at 734, and

27  whether the DHCS "has in place a comprehensive deinstitutionalization scheme" that is "effectively

28  working[.]"  See Sanchez, 416 F.3d at 1067-68.  It is undisputed that, for the time being, the DHCS

1  "has authorized all medically necessary Waiver services to allow Plaintiffs to remain safely in their

2  homes, even if those services exceed the individual cost limits." (Dkt. 194, Joint Br. at 35; see id.

3  at 20, 22 & 25 (describing letters sent to plaintiffs by the DHCS stating that the DHCS will pay for

4  medically necessary Waiver services that exceed the Waiver's current individual cost limit)).

5  However, the parties vigorously dispute the long-term implications of the DHCS's ad hoc decision

6  to suspend the Waiver's cost limits with respect to plaintiffs.  The DHCS contends that plaintiffs

7  "face no risk of institutionalization" because it "has authorized all three Plaintiffs to receive at least

8  24 hours of care per day." (Id. at 35).  Plaintiffs respond that the DHCS's "opaque and unwritten

9  ad hoc exceptions policy . . . does not ensure that individuals who require additional care to remain

10  in the community will have the necessary alternative services identified and put in place to avoid

11  unnecessary institutionalization." (Id. at 32).

12      The court is troubled by the fact that the DHCS could, at any time, rescind its letters to

13  plaintiffs authorizing medically necessary services above the Waiver's cost limits, and that the

14  DHCS is essentially "refus[ing] to commit to provide Plaintiffs with ongoing services[.]" (Dkt. 194,

15  Joint Br. at 33).  Importantly, "Defendants have no written policy or process for authorizing

16  exceptions to the cost ceilings." (Dkt. 112, SOI at 2).  These facts tend to show that plaintiffs are

17  at risk of institutionalization as a result of the cost limits imposed by the Waiver program.

18  However, there are material factual disputes regarding whether that risk is "serious" for purposes

19  of the ADA's integration mandate.  See Dreyfus, 697 F.3d at 734.  For example, defendants have

20  offered evidence showing that plaintiffs "have been well cared for and have remained safely in

21  their homes" at all times while receiving their currently authorized services. (See Dkt. 194, Joint

22  Br. at 36) ("Plaintiffs' contention that they are fighting to remain in their homes is vehemently

23  disputed and contradicted by the evidence.").  Defendants have also offered evidence showing

24  that their ad hoc decisions to except plaintiffs and other patients from the Waiver program's cost

25  limits – although based on unwritten policy – add up to an "effectively working"

26  deinstitutionalization scheme.[5]  (See id. at 12) (noting "the large Waiver population and the

27  _____

28      [5]  For example, defendants assert that although the DHCS "has no written policy or written criteria to approve services above the individual cost limit for beneficiaries in the currently

competing budgetary restraints"); Sanchez, 416 F.3d at 1067-68 (holding that the court must consider "existing budgetary constraints and the competing demands of other services that the State provides" in determining whether a state's deinstitutionalization scheme is "effectively working").  Thus, while the court has serious concerns about whether the Waiver program comports with the ADA's integration mandate, the court finds that summary judgment is not appropriate at this time.  See Barlow, 943 F.2d at 1134 (holding that, at the summary judgment stage, the court must consider the facts in the light most favorable to the non-moving party).

Similarly, there are genuine disputes of material fact regarding whether plaintiffs are "without medically necessary direct care" because the DHCS has not authorized "all the services that Plaintiffs' doctors have recommended."  (See Dkt. 194, Joint Br. at 32-33).  Specifically, defendants have presented the opinion of Dr. Rajiv Dhamija, who evaluated all three plaintiffs and concluded that their currently-authorized services are sufficient to ensure that they remain safely in their homes.  (See id. at 19, 22 & 24).  While the DHCS maintains the right to determine – through the appropriate administrative process – what services are medically necessary for Waiver program participants in the first instance, (see Dkt, 194, Joint Br. at 37); Cal. Welf. & Inst. Code § 14059.5 (defining a "medically necessary" service), it is unclear to what extent the DHCS is obligated to consider or otherwise take into account the opinions of plaintiffs' medical providers. In light of that uncertainty and given the factual disputes regarding what services are medically necessary for plaintiffs, the court is persuaded that summary judgment is not appropriate at this time.

## CONCLUSION

Based on the foregoing, IT IS ORDERED THAT:

1.  Plaintiffs' Motion for Summary Judgment **(Document No. 193)** is **denied**.

2.  Defendants' Ex Parte Application to: Notify the Court of New Authority [] **(Document No. 305)** is **granted**.

---

approved NF/AH Waiver, it has authorized medically necessary waiver services costing in excess of the individual cost limit and have authorized such services for over 400 NF/AH Waiver participants to ensure that they remain safely in their homes." (Dkt. 195, Parties' Statement of Uncontroverted Facts at D93).

1       3.  Plaintiffs' Ex Parte Application for Expedited Ruling on Plaintiffs' Pending Motion for Summary Judgment **(Document No. 311)** is **denied as moot**.

Dated this 5th day of June, 2017.

/s/

Fernando M. Olguin<br>United States District Judge